The **PENNSYLVANIA RAILROAD CO.**

v.

**UNITED STATES.**

No. 446–52.

United States Court of Claims.
Nov. 2, 1954.

See also, D.C., 124 F.Supp. 52.

Lawrence Cake, Washington, D. C., for plaintiff. Raymond A. Negus, Washington, D. C., was on the brief.

Thomas H. McGrail, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff was the ultimate carrier of a number of shipments of plywood from Tacoma, Washington, to New York and Baltimore. The plywood was obtained by the Government from a supplier, Pacific Forest Industries, which manufactured it at various places in the State of Washington. The Government's contracts with the supplier called for the delivery of the plywood f. o. b. cars, Tacoma. The arrangements of the parties contemplated that the plywood should be shipped into Tacoma and stored there temporarily and then loaded on cars for carriage to the Atlantic ports.

In the circumstances recited above, railroad rate tariffs provide for what is known as "transit", that is, the right of the shipper to pay, not the local rate into the transit point plus the local rate out from the transit point to the destination, but the through rate from the point of origin to the destination, as if the carriage had been uninterrupted. If the shipper claims the transit privilege, he must, in addition to the through rate, pay a small charge for the trouble caused to the railroad by the interruption of the carriage. Even after paying this charge, the transit privilege saves the shipper a considerable amount.

The mechanics of the application of transit are shown in finding 13. The shipper pays the local rate into the transit station. When the goods are shipped out from the transit station, he then pays the amount of the through rate from the point of origin to the destination, less the local rate which he has already paid when he shipped the goods into the transit station, or he pays the full amount of the through rate and receives a refund of the local rate which he paid when he shipped the goods into the transit station. When the same person pays the freight for both parts of the carriage, there is no real difference between the two methods of handling the transit question. When, however, the goods change ownership at the transit point, the use of one or the other of the two methods will determine who, at least initially, gets the money saved by the application of transit.

■ The plaintiff contends that the shipments here in question were not entitled to the benefit of transit. We do not agree. The transit tariff, summarized in finding 13, is directly applicable. The plaintiff does not contend, and could not, that the mere fact that the ownership of the goods changes at the transit point makes transit inapplicable. The transit tariff had a section entitled "Change of Ownership" which showed that it contemplated that occurrence. The plaintiff argues that, somehow, the shipments out of Tacoma were "separate and independent movements" not entitled to the transit privilege. We are not told wherein they were different from the usual situation to which transit is applicable. The fact that the shipments out of Tacoma were on Government bills of lading, while the shipments in were not, denotes nothing but a change of ownership at the transit point which, as we have said, does not make transit inapplicable. The plaintiff cites two decisions of the Interstate Commerce Commission, Cudahy Packing Co. v. Baltimore & Ohio Railroad Co., 263 I.C.C. 503, and Great Lakes Steel Corporation v. Baltimore & Ohio Railroad Co., 264 I. C.C. 779.

In each of the cited cases, as in the instant case, the goods were shipped into the transit point by a supplier, and were shipped out to the Government as consignee on Government bills of lading. In both cases it appeared that the Government did not desire that transit should be applicable. In the Cudahy case, this was because the Government desired to interrupt the carriage at a second point, and claim transit for that interruption. In the Great Lakes case it is not apparent why the Government desired to regard the shipment out of the transit point as separate.

The cases cited by the plaintiff show only that when different persons own the goods and pay the freight on the inbound and outbound shipments, both, or at least the second shipper, must elect to claim transit, in order to give the inbound shipper the advantage of it. In the instant case there is no question as to the intent of both shippers to claim transit.

■ The plaintiff says that transit, if otherwise allowable, was lost by failure to comply with Item No. 1512 of the tariff, quoted in finding 13, which requires, apparently, that the inbound shipper make a statement as to why someone else is making the outbound shipment. In the instant case the inbound shipper, Pacific Forest Industries, was the consignor in the outbound shipment, hence the continuity of interest was shown be-

tween the inbound and outbound shipments, and Item No. 1512 was not applicable.

The plaintiff urges that, if transit was applicable, still the Government was not entitled to the benefits of it because the Government's contracts with the supplier provided that the supplier should get the benefits of transit. The contract under which practically all of the plywood in question was purchased contained the following language:

"The following prices are per thousand square feet either FAS vessel, Port of Tacoma Pier, or FOB cars Tacoma. The prices are predicated on the Pacific Forest Industries receiving the In Transit privilege from the railroads on plywood received from the producing mills on commercial bills of lading and shipped out on Government bills of lading. If for any reason the railroads refuse to grant transit refunds on this movement, the prices are subject to adjustment to the extent that such transit refunds affect the prices quoted."

The Government would have us interpret this language as applicable only to the delivery of plywood to ships, in which case the Government would have no part in the railroad transportation and no interest in transit. That is a possible interpretation. Since the through rate from the mill points to the Atlantic port destinations was the same as the rate from Tacoma to those destinations, the transit saving was equal to all the freight which the supplier paid into Tacoma on the shipments which went out of Tacoma by rail, whereas, if they had gone out by ship, the supplier would have borne the freight charges, less the transit saving. But the quoted language of the contracts seems to us to say that the supplier was to have the saving resulting from the application of transit. As to most of the shipments, refunds representing the transit reductions were made to the supplier. We think that money went into the right hands. Late in the course of dealing of

the parties the railroads took the position, which we think was erroneous, that transit was not applicable. They stopped making refunds, and brought suits in courts of the State of Washington to recover the refunds which they had made. We are told that those suits are still pending.

The Government, though it claims that transit was applicable, gives the plaintiff no credit for the refunds made to the supplier, saying that it, and it alone, was entitled to the benefit of transit. It says that the shipper who ships out of the transit station and pays for the outbound shipment is alone entitled to the saving. We do not understand why this should be so. If the parties have agreed as to who should get the saving, that would seem to settle the question, at least as between themselves. If they have not agreed, it would seem that the saving should be apportioned between them on some fair basis. If both should claim the refund or reduction before the railroad had paid or allowed it to either, the railroad might well have a right to interplead them.

In the instant case, the railroads in the State of Washington, perhaps because the supplier exhibited to them the supply contracts containing the language quoted above, made the refunds to the supplier. This was one of the alternative methods described in the transit tariff, and was, in the circumstances, the right one. In the situations where the railroads refused to make the refunds, we think they became liable to the supplier for the refunds. If they had made the refunds to the Government, we think the Government would have, under the language of its contract with the supplier, been obliged to pay over the refund to the supplier. That being so, the Government had no right to pay itself by offset, as it did, since by doing so it came into possession of money to which it was not entitled.

As shown in finding 7, one bill of lading covered plywood requisitioned pursuant to Contract DTA–TPS 17527. This contract, unlike the one under which all the other plywood in question was

purchased, did not contain the language which we have quoted above and which expressly granted to the supplier the saving resulting from transit. We are not told what was the significance of this omission. We do not know whether it was deliberate or accidental. So far as appears, there was no refund to the supplier, the inbound shipper, on this shipment. If the transit saving were apportioned, practically all of it would belong to the Government, which was the freight-payer for the long segment of the transportation. In these circumstances we think the Government was entitled to claim the transit credit. It has paid itself by offset and the plaintiff cannot recover that money, which amounts to $339.62.

As to the land-grant deductions taken by the Government, it appears from the findings that 96.4% of the plywood in question was requisitioned on British lend-lease requisitions showing the intended use of the plywood to be for military purposes. That being so the Government was entitled to land-grant deductions on that percentage of the plywood. It was not entitled to such deductions on the remaining 3.6 percent of the plywood, and it paid itself, by offset, $170.81 too much.

The plaintiff is entitled to a judgment for $1,290.10.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:

1. The plaintiff, a corporation, is a common carrier by railroad, over its own lines and jointly with other common carriers by railroad.

2. In 1943 and 1944, the plaintiff participated, as delivering carrier, in the transportation of shipments of plywood for the defendant, from Tacoma, Washington, to destination points on plaintiff's lines, as stated in Exhibits A, B, and D to the petition.

3. The transportation charges on the said shipments were billed and claimed by the plaintiff as the destination carrier, in accordance with the terms of the bills of lading, on the basis of the published tariff rates applicable from the original mill points to the destination points shown in the exhibits to the petition.

4. The plaintiff's charges were originally paid by the defendant's disbursing officers but subsequently upon the audit of the bills by the General Accounting Office, overpayments were determined and deductions were made from other bills due the plaintiff in the amount of the overpayments so determined, with the result that the plaintiff's charges for the service in question were settled and paid by the defendant on the basis of land-grant rates (i. e. the published tariff rates less land-grant deductions), less further deductions as transit credits in the amount of the local charges paid on the same plywood into Tacoma.

5. Of the deductions so made, $4,744.85 was on account of deductions for land-grant and $1,458.91 was on account of transit credits claimed by the defendant under NPCFB Local Freight Tariff No. 34–W, I.C.C. No. 618.

6. The issues in this case are (1) whether the published tariff rates were subject to land-grant deductions, and, if so, to what extent (in percentage) were such deductions in order, and (2) whether the defendant is entitled to the claimed transit credits.

7. The shipments in question were shipments of plywood procured by the defendant, pursuant to British lend-lease requisitions, under two contracts made by the defendant with Pacific Forest Industries, Inc., one designated DA–TPS–17527, dated October 8, 1942, and the other DA–TPS–36458, dated August 17, 1943.

The Government bills of lading issued at Tacoma bore references to the procurement contracts and to the lend-lease requisitions, as follows:

| Bill of Lading | Contract | Requisition |
|---|---|---|
| EXHIBIT A | | |
| DA–TPS–510555 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| EXHIBIT B | | |
| DA–TPS–509070 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 509075 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 509755 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510558 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510933 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510934 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510938 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 511230 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 640136 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 640123 .... | | |
| EXHIBIT D | | |
| DA–TPS–297747 .... | DA–TPS–17527 .. | 11305 |
| 509071 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 509072 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 509756 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510379 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510377 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510386 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |
| 510937 .... | DA–TPS–36458 .. | 11305, 11995, 13035 |

### First Issue

8. The defendant took title to the plywood in question at Tacoma.

9. The British lend-lease requisitions stated the intended use of the plywood requisitioned, of which the shipments in question were a part, for military purposes and for essential civilian requirements, as follows:

| | Military | | Civilian | |
|---|---|---|---|---|
| Req. UK–11305 | | | | |
| 50,000 M sq. ft. (normal glueing)....... | 90% | 45,000 M | 10% | 5,000 M |
| 11,000 M sq. ft. (resin bonded) .......... | 60% | 6,600 M | 40% | 4,400 M |
| Req. UK–11995 | | | | |
| 25,000 M sq. ft. (normal glueing)....... | 98% | 24,500 M | 2% | 500 M |
| 45,000 M sq. ft. (resin bonded) .......... | 100% | 45,000 M | | ............. |
| Req. UK–13035 | | | | |
| 100,000 M (moisture resistant) ......... | 98% | 98,000 M | 2% | 2,000 M |
| 100,000 M (water resistant) ........... | 100% | 100,000 M | | ............. |
| | | 319,100 M | | 11,900 M |

On the basis of the foregoing figures, 96.4% was requisitioned for military use and 3.6% for civil use.

10. The deductions for land-grant as stated in Finding 5, if justified, should be limited to 96.4% or $4,574.04, since 96.4% of the cargo was requisitioned for military use. The remaining 3.6% was for civil use and the deductions amounted to $170.81.

### Second Issue

11. The procurement contracts, DA–TPS–17527 and DA–TPS–36458, stated the prices to be paid by the defendant "FAS Tacoma, Washington" and "FAS vessel, Port of Tacoma Pier, or FOB cars, Tacoma". Contract DA–TPS–36458 also contained the following provision:

The following prices are per thousand square feet either FAS vessel, Port of Tacoma Pier, or FOB cars Tacoma. The prices are predicated on the Pacific Forest Industries receiving the In Transit privilege from the railroads on plywood received from the producing mills on commercial bills of lading and shipped out on Government bills of lading. If for any reason the railroads refuse to grant transit refunds on this movement, the prices are subject to adjustment to the extent that such transit refunds affect the prices quoted.

Contract DA–TPS–17527 did not contain this provision. Only one requisition was made under that contract. The amount deducted by the defendant on ac-

count of the application of transit to the plywood covered by that requisition was $339.62. The bills submitted by Pacific Forest Industries to the defendant for the plywood purchased by the defendant bore notations as follows:

Prices: Per M sq. ft. FOB cars Tacoma, net.

12. The defendant took title to the plywood at Tacoma and the shipments from Tacoma were made on Government bills of lading. These bills of lading showed Pacific Forest Industries as the consignor and an agency of the Government as consignee.

13. NPCFB Local Tariff No. 34–W, I.C.C. No. 618, which is called the transit tariff, provides generally and upon specified terms and conditions that carload shipments of lumber and similar products, including plywood, may be shipped to certain points called transit stations, of which Tacoma is one, for dressing, kiln drying, manufacturing, milling, sorting, storage, and staining in transit, and thereafter to further destinations, at the rate and minimum weight applicable from point of origin to destination on the commodity shipped into or the product forwarded from the transit station (whichever is higher), plus the transit charge shown. The application of the through rate to such shipments is shown in Item 1545, as follows:

"Item No. 1545. Rates To and From Transit Station.

"(a) Rate into the transit station will be the current tariff rate on the commodity shipped from point of origin to such station.

"(b) Rate from the transit station to transit destination will be the difference between the rate collected to the transit station and the transit rate point of origin to transit destination on the commodity shipped into or the product forwarded from the transit station (whichever is higher) in force on the date of shipment from point of origin as shown on freight bill surrendered plus transit arbitrary and additional charge (if any) for additional service, out-of-line or back haul as authorized in lawfully published tariffs.

The through charge from point of origin to transit destination will in no case be lower than the rate from transit station on the commodity forwarded plus the transit arbitrary and back or out-of-line haul charges.

"(c) When a carload of one or more products named in Item 1500 is forwarded from transit station, the charges from point of origin to transit station on the basis of weight from transit station, but not in excess of original weight may be refunded to the shipper.

"Bill-of-lading may then be issued and shipment waybilled to final destination at rate from point of origin to final destination in effect on date shipment moved from point of origin."

Another item of the tariff, on change of ownership, provides as follows:

"Item No. 1512. Change of Ownership.

"Shippers operating under these rules may forward shipments under bills of lading showing names other than their own and in such instances the transit shipper must add to the shipping certificate the following:

"'For commercial reasons the shipment referred to on this reshipping memorandum is being made in the name of .........'"
(Signature of shipper)

14. With respect to the shipments in question, to which the defendant took title at Tacoma and which were made on Government bills of lading from Tacoma, no statement was added to the shipping certificate pursuant to the provisions of Item 1512 of the transit tariff, regarding "Change of Ownership".

15. Although plaintiff's petition, as originally filed, asked for judgment in the sum of $7,735.27, it was agreed by plaintiff at a pre-trial conference held

April 9, 1953, to withdraw Bill #8–70999 outlined in Exhibit "A" attached to the petition in the amount of $395.21.

It was also agreed by the plaintiff at the pre-trial conference that the following items have been outlawed by the statute of limitations and they were withdrawn:

Carrier Bill No. 9–27–45095
  (Ex. A to Petition) ........ $256.35
Carrier Bill No. 9–27–51614
  (Ex. B to Petition) ........  296.20
Carrier Bill No. 9–27–52231
  (Ex. B to Petition) ........  301.30
Carrier Bill No. 52792
  (Ex. C to Petition) ........  282.45
      Total ................ 1,136.30

16. The defendant is entitled to land-grant deductions in the amount of $4,-574.04, and to transit benefits in the amount of $339.62.

17. The plaintiff is entitled to recover $170.81 for land-grant deductions and $1,119.29 for transit credits improperly taken by the Government.