The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY

v.

The UNITED STATES.

No. 38–52.

United States Court of Claims.

May 3, 1955.

Lawrence Cake, Washington, D. C., for plaintiff. Raymond A. Negus, Washington, D. C., was on the brief.

Francis X. Daly, Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

The plaintiff, a common carrier by railroad, sues the Government for the difference between the land-grant rate, which it billed and received, and the higher commercial rate to which it claims to be entitled. The shipments in question occurred in 1946 and consisted of dried and canned foodstuffs, drygoods, soap and drugs shipped at the request of the War Department on Army bills of lading from various points in the United States to Oakland, California, for reshipment overseas. Apparently it was not until some time following the shipments and receipt of payment computed at land-grant rates that plaintiff conceived its error in not billing at commercial rates.

The problem involves an interpretation of section 321(a), Title III, Part II, of the Transportation Act of 1940, 54 Stat.

898, 954, 49 U.S.C.A. § 65(a),[1] which the Court has heretofore considered under almost identical circumstances, Union Pacific Railroad Company v. United States, 109 F.Supp. 251, 124 Ct.Cl. 254.

The parties have stipulated that, if plaintiff's interpretation of the Transportation Act is correct, it is entitled to an additional $24,171.55, whereas should defendant prevail, plaintiff must refund $2,362.63 for certain overpayments attributable to causes not pertinent to the immediate issues.

The letter quoted in finding 4. a. clearly indicates that the Army was to assume the initial burden of shipping and distributing the relief supplies to liberated areas under the rehabilitation program of the United States until such time as civilian agencies could take over this function.

The articles in question were procured, shipped, and distributed by the Army to the civilian populations of liberated and occupied areas in Europe and Asia, and were consumed and used by such populations. This was all accomplished pursuant to this program, paid for out of funds appropriated for that purpose by Congress, and executed by the Army under the supervision of its Civil Affairs Division. The military officials represented to Congress that the program was designed in response to military necessity. It is admitted that the supplies involved in this case were shipped solely for civilian consumption and use. The Government contends that even though the supplies were for civilian use they were shipped for military use because they were a military necessity in order to allay civilian unrest and disease, to curtail sabotage and stealing, to protect lines of communication, and assure the security of our occupying forces. We are of the opinion that the obvious primary purpose of shipping these supplies was humanitarian and/or political rather than military necessity, even though there were some incidental benefits to the military. The primary beneficiaries were alien civilians caught in the wake of the war.

■ The original enactment of section 321(a) of the Transportation Act of 1940 excepted from application of full commercial rates the "transportation of military or naval property of the United States moving for military or naval and not for civil use".[2] Accordingly, in order for land-grant rates to apply two requirements must be met, the property must be military or naval and it must be moving for a military or naval, and not a civil use. From the pattern of decided cases, in all but a few instances ascertainment of the intended use normally will determine the nature of the property.

Aside from minor variations in facts, the instant case is indistinguishable in principle from United States v. Powell, 330 U.S. 238, 67 S.Ct. 742, 91 L.Ed. 869, and the Union Pacific case, supra. The factual distinctions between this and Union Pacific relied upon by defendant to dictate an opposite legal conclusion are evidence here (1) that the Army supervised the supplies from their procurement through their distribution for consumption by foreign civilian populations; (2) that the supplies in question were earmarked "TOG" on the shipping documents (as were all supplies shipped pursuant to the Army program in occupied and liberated areas, to distinguish them

1. "Sec. 321.  (a) Notwithstanding any other provision of law, but subject to the provisions of sections 1(7) and 22 of the Interstate Commerce Act, as amended, the full applicable commercial rates, fares, or charges shall be paid for transportation by any common carrier subject to such Act of any persons or property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use * * * *."

2. This provision was eliminated from section 321(a) by the Act of December 12, 1945, 59 Stat. 606, 49 U.C.S.A. § 65(a). While the elimination was made effective as of October 1, 1946, rights accrued prior thereto were not affected.

from all other supplies used by the Army); (3) that the supplies were, when shipped by plaintiff, in a final form ready for their ultimate consumption; and (4) that the movements were from the point of manufacture to the point of embarkation *en route* to an overseas destination.

While the opinion in the Union Pacific case does not disclose that the Army attended and supervised the supplies from their manufacture through their distribution overseas, the record itself indicates that this was so.

There is no question from the record in the Union Pacific case but that the commodities were part of the same Army program in aid of liberated and occupied areas as were the articles in the instant case. The presence or lack of a symbolized shipping designation on bills of lading does not control or vary the known facts that in both cases the supplies were actually used by and for civilian populations in the war's aftermath.

It cannot be perceived how either of the remaining distinctions contended by defendant would affect the legal principle. The fact that the articles shipped here were in a finished form ready for use by the final consumer would, it would seem, argue their "civil" use more conclusively than articles such as the fertilizer ingredients in the Union Pacific case, which were at critical times a manufacturing step removed from the form in which they left the country. In an analogous situation in Northern Pacific Railway Company v. United States, 330 U.S. 248, 67 S.Ct. 747, 91 L.Ed. 876, the court discounted the effect of an intermediate manufacturing stage on the principle involved, and stated that the end use of the shipment controls. United States v. Powell, supra.

In considering the similarities of these facts with those in Union Pacific, it should be noted that not only did the shipments in both cases occur in approximately the same post-hostilities period, but the essential facts emphasized by defendant in the instant case as to the military necessity attending the aid programs were considered and rejected by the court in the Union Pacific opinion. Their elaboration in the present record does not alter their significance.

The Supreme Court in the Powell case, supra, held that a shipment of fertilizer to England under the lend-lease program was not a shipment for military use. The Court stated in that case, 330 U.S. at page 242, 67 S.Ct. at page 744, that " * * * it is not the transportation of 'all' property of the United States that is excepted but only the transportation of 'military or naval' property of the United States." The Court further stated that " * * * the excepted property must be 'moving for military or naval and not for civil use.' Thus the scope of the clause is restricted both by the nature of the property shipped and by the use to which it will be put at the end of the transportation." In that case the peoples of England were our potential allies, and the primary purpose in shipping material was to build up the strength of England in order that she could successfully prosecute the war with Germany. This would seem to be a stronger case in favor of the Government. Yet, in that case, the Court held the shipment was not for military use.

Just as the fertilizer ingredients, in Union Pacific and Powell, supra, bestowed only an incidental benefit on the military effort, and were primarily for civilian use, so the articles in the instant case fall into the same category.

The lexicological distinction urged by defendant between "civil" and "civilian" use is without merit. This was met in the Powell case where both terms were used interchangeably and the court said: "But in common parlance, such activities [i. e., ones comparable to the program in the instant case] are civil, not military."

We are of the opinion that United States v. Powell, supra, and Union Pacific Railroad Company v. United States, supra, are controlling in this instance and that the goods shipped were for civil rather than military use.

Therefore, plaintiff is entitled to recover. Judgment will be entered in the amount of $24,171.55.

WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

M. Clemenceau said "War is too important to be left to the generals". The court has, in its decision and opinion, subscribed to that sentiment. The generals had the absurd notion that dried and tinned foodstuffs, cloth, soap and drugs were military necessities, when a victorious American Army occupied an enemy country. The generals persuaded a Congress which, at the time, entertained no humanitarian sentiments toward these enemy countries, to this absurd view, and thereby induced it to appropriate money to buy and transport these things. But the judges know that you just don't fight wars that way. Alexander the Great did not do it; Julius Caesar did not do it; The Ghengis Khan did not do it; Napoleon did not do it. So, whatever the generals may have thought they were doing, the judges know that they were not carrying on a military occupation. The judges know that they were engaging in social work and politics.

. When I weigh the judgment of the judges against the judgment of the generals, I find that the judgment of the generals was better. This was proved by the history of our military occupation of Japan, Korea and Germany. Resistance movements such as those which had bedeviled the Germans and Japanese in the countries occupied by them, and impaired the success of their armies, did not occur. Epidemics among the civilian population which would or might have disabled our troops did not occur. Because there was no resistance or disorder in the population of the occupied countries, it was possible to withdraw the greater part of our troops much more rapidly than would otherwise have been possible.

The goods so distributed were, then, in a sense, substitutes for soldiers and rifles, for the purposes of the Army in successfully occupying the conquered countries until the political authorities could make up their minds what to do with them. The fact that the Army's program showed foresight and imagination beyond what Alexander the Great might have shown, is, of course, to the credit of the Army. And it does not prove that the goods which is used to win military success, were not, though historically unconventional, used for a military purpose.

By the direction of the court, Commissioner Bernhardt not only made findings of the facts, but recommended to the court a conclusion of law. His recommended conclusion was that the goods in question were moving for civil and not for military use, and that, therefore, land-grant rates were not applicable. He supported his conclusion with a thoughtful and well-written opinion. However, in the commissioner's finding 4(b) he stated, of the "end purposes" of the Army's program of distribution of goods such as those here in question, "Such purposes were properly a matter of military necessity both during and after hostilities." Yet in his opinion he says "But these military purposes, however intended, were served only incidentally. The primary beneficiaries were alien civilians caught in the wake of war."

The commissioner's opinion was influenced greatly by our recent decision in Union Pacific Railroad Company v. United States, 109 F.Supp. 251, 124 Ct.Cl. 254. In that case the goods shipped were raw materials destined to be manufactured into fertilizer at an ordnance plant operated by the Government's Emergency Export Corporation. The shipments were made by the Government, from various points in the United States to the ordnance plant. After the materials had been manufactured into fertilizer, the fertilizer was to be shipped to seaports from whence it was to be transported abroad to be distributed by the Army

under the same program which has been described in this opinion. We held that the shipments of the raw materials to the manufacturing plant were not movements "for military use." We relied on United States v. Powell, 330 U.S. 238, 67 S.Ct. 742, 91 L.Ed. 869, in which the Supreme Court held that a shipment of fertilizer to England under the lend-lease program was not a shipment for military use.

The commissioner's reliance upon our Union Pacific decision would make it necessary for. us, if we would hold that the instant shipments were for military use, either to distinguish the Union Pacific case or overrule it, or, perhaps, to make use of some of each of those judicial processes. In that case the shipment of the raw materials to the factory in the United States was a step farther away from the actual ultimate use of the fertilizer by the Army than is the shipment in the instant case. The intended ultimate use of the fertilizer after it had been manufactured and carried to the occupied countries was also not so immediately connected with the Army's purposes as was the distribution of the goods, ready for consumption, which occurred in the instant case.

In various legal situations, the applicability of a doctrine depends not so much upon the logic of the relation between two acts as upon the directness or proximity of that relation. Legal cause in the law of negligence; directness of the effect upon interstate commerce of the activity sought to be prohibited or regulated, in constitutional law; remoteness in the law of damages, are examples. We think that the factual differences between the instant case and the Union Pacific case are of more than superficial importance.

In the Union Pacific case, the only precedent cited by the plaintiff was United States v. Powell, supra. In that case, as in Union Pacific, the material involved was fertilizer. But the fertilizer was being sent to England as a "lend-lease" item, and was to be used on farms in England to make that country's agricul-

tural production more nearly adequate to the country's needs. The lend-lease program was a defense measure, as were our domestic programs of price control, materials allocations, etc., in this country. But the shipment was not for military use, any more than the furnishing of fertilizer by the Government to American farmers to increase our food supply and thus strengthen our ability to defend the country would be a shipment for military use.

In our opinion in the Union Pacific case, we relied entirely upon the Supreme Court's decision and opinion in the Powell case. Upon reconsideration, I think that that case is readily distinguishable from cases like the one now before us. In the case of Northern Pacific Railway Company v. United States, 330 U.S. 248, 67 S.Ct. 747, 750, 91 L.Ed. 876, decided on the same day as the Powell case, the Court in holding that the shipment there involved was for military use, said "It is the relation of the shipment to the military or naval effort that is controlling under § 321(a)." In the instant case our commissioner has found, and I would find, as to the purposes of the shipments, "such purposes were properly a matter of military necessity both during and after hostilities." Use by the Army to satisfy a military necessity would seem to be a military use. The Supreme Court in the Northern Pacific case, supra, 330 U.S. at page 257, 67 S.Ct. at page 752, held that the exception stated in Section 321(a) should be liberally construed in favor of the Government, since the section, other than the exception, was a grant of public property to an individual, or the relinquishment of a public interest.

In the Union Pacific case, supra, the facts found were based upon a stipulation, without oral testimony. Attached to. the stipulation were documents showing the purpose of the program of distribution. In the instant case the Government produced as a witness Major General John 'H. Hilldring, who was a member of the staff of the Army Chief of Staff, and was in charge of the pro-

598

gram of distribution. It also produced Lieutenant General John C. H. Lee who was Commanding General of the Army Services of Supply in Europe, who had supervision over distribution of the kinds of goods here involved. The testimony of these officers was most impressive, as is shown by the finding of our commissioner, who heard their testimony, that the distribution was a matter of military necessity. It may well be that if the Government's position in the Union Pacific case had been as well supported, the decision would have been different.

I would dismiss the plaintiff's petition.

JONES, Chief Judge, joins in the foregoing dissent.