**UNITED STATES of America,**
**Appellant,**

v.

**SPOKANE, PORTLAND & SEATTLE**
**RAILWAY COMPANY, Appellee.**

**No. 15852.**

United States Court of Appeals
Ninth Circuit.
Oct. 24, 1958.

George C. Doub, Asst. Atty. Gen., Alan S. Rosenthal, Attorney, Department of Justice, Washington, D. C., C. E. Luckey, U. S. Atty., Portland, Or., for appellant.

Charles A. Hart, Fletcher Rockwood, Cleveland C. Cory, Hugh L. Biggs, Portland, Or., for appellee.

Before HEALY, HAMLEY, and HAMLIN, Circuit Judges.

HAMLEY, Circuit Judge.

Plaintiff railway company brought thirteen actions against the United States to recover deductions made by the Government in paying the company's transportation charges.[1] The actions were consolidated for trial, and five were later dismissed. After a trial without a jury, a judgment and an amended judgment were entered for plaintiff in the amount of $30,997. The Government appeals.

The eight actions disposed of by these judgments involve the charges made by appellee rail carrier for certain transportation provided between 1942 and 1945. This transportation consisted of shipments of government-owned industrial equipment and supplies to Columbia river ports in Oregon for exportation to the Union of Soviet Socialist Republics.

The shipments were made on government bills of lading from eastern, midwestern, and western points in the United States, for account of the Procurement Division of the Treasury Department. That department had procured the materials and authorized their shipment under the provisions of the Lend-Lease Act.[2] This was done pursuant to requisitions received from duly authorized officials of the Soviet Government Purchasing Commission in the United States.

1. Jurisdiction was asserted under the Tucker Act, 28 U.S.C.A. § 1346(a) (2).

2. Act of March 11, 1941, 55 Stat. 31, 22 U.S.C.A. § 411 et seq.

Appellee, as the terminal carrier and collection agent for all connecting carriers, rendered bills for this transportation. These bills were paid upon presentation, as required by § 322 of the Transportation Act of 1940, 49 U.S.C.A. § 66. After a postpayment audit of the bills, the Comptroller General concluded that the Government had been overcharged. With respect to some of the shipments, it was his determination that the Government was entitled to land-grant deductions, and that the computation of charges on the basis of full commercial rates was therefore improper. As to other shipments, the Comptroller General determined that the transportation charges should have been based on rates published in the relevant export tariff, rather than on the higher rates published in the domestic tariff.

The company was requested to refund the amount of the administratively-determined overpayment. It refused to do so. The asserted overpayment was therefore deducted by the Government when it payed subsequent bills, as authorized by § 322, referred to above. The carrier then brought these actions to recover the amount of the deductions.

The questions presented on this appeal pertain to one or the other of the two unrelated matters of land-grant rates and export rates. We will first consider those questions which are associated with the matter of land-grant rates.

The parties are agreed that, if the shipments in question on this branch of the case constituted transportation of "military or naval property of the United States moving for military or naval and

not for civil use," the Government was entitled to the land-grant rate. The quoted language is from § 321(a) of the Transportation Act of 1940, 54 Stat. 898, 954, 49 U.S.C.A. § 65.[3]

The parties are also agreed that the freight in question was "property of the United States" within the meaning of the quoted provision. They disagree as to whether it was "military or naval" property, and whether it moved "for military or naval and not for civil use."

■■ Both of these quoted conditions must be met in order for the land-grant rate to apply. United States v. Powell, 330 U.S. 238, 242, 67 S.Ct. 742, 91 L.Ed. 868. As a practical matter, however, a ruling that the freight moved "for military or naval and not for civil use" would also amount to a determination that it was "military or naval property." As pointed out in Northern Pacific R. Co. v. U. S., 330 U.S. 248, 254, 67 S.Ct. 747, 750, 91 L.Ed. 876, " * * * in general the use to which the property is to be put is the controlling test of its military or naval character. * * * "[4] Accordingly, the critical inquiry was and is whether this government property moved "for military or naval and not for civil use."

The trial court found and concluded that one of the nine categories of freight which were involved in these shipments moved for military or naval and not for civil use. This category embraced equipment to be used at Soviet Arctic bases. As to the remaining eight categories, the court found and concluded that the property did not move for military or naval use.[5]

---

3. While the quoted provision was eliminated from § 321(a) by the act of December 12, 1945, 59 Stat. 606, 49 U.S. C.A. § 65, it was in effect during all of the time here in question. Appellee's connecting carriers were subject to this provision because they were so-called land-grant roads. Appellee is not a land-grant road, but was subject to this provision because it had theretofore entered into an equalization agreement with the United States, as authorized by § 22 of

the Interstate Commerce Act, 49 U.S.C.A. § 22.

4. See, also, Atchison, Topeka & Santa Fe Ry. Co. v. United States, Ct.Cl., 130 F. Supp. 593, 594, where the court said: " * * * From the pattern of decided cases, in all but a few instances ascertainment of the intended use normally will determine the nature of the property.",

5. While this ruling was denominated a "finding of fact," it actually involves both a finding of fact and a conclusion of law.

The Government questions, on a number of grounds, this finding and conclusion of the trial court. One such contention is that the trial court incorrectly concluded that the materials in question could not be held to be for military or naval use unless there was evidence that they had actually been applied to such use. The Government argues, in effect, that actual use is immaterial, and that the court should have considered only the evidence pertaining to the intended use at the time the transportation was provided.

The record indicates that the court deemed it significant that there was little or no proof that the goods actually had been devoted to military or naval uses. Whether the court regarded this as a fatal deficiency in the Government's case we are unable to say. In the only finding made in support of the ultimate finding and conclusion referred to above, the court stated:

> The court had to determine the precise uses for which this property moved, and then *decide* whether those were "military or naval and not civil" uses, within the meaning of § 321(a).

6. The court there said: "* * * Tariff rates cannot be applied retrospectively, neither can the character of the material be made to depend upon an independent investigation concerning its use after it has passed from the consignee of the shipper."

7. In Northern Pacific Ry. Co. v. United States, D.C., 101 F.Supp. 29, 31, it was expressly stated, citing the Sonken-Galamba case, that the character and status of the shipment of military stores by common carrier should be determined at the time of the shipment. It was accordingly held that shipments of military and naval property from overseas to salvage and rehabilitation centers were for "military or naval use," though part of such material was later discarded for civilian use and sold as war surplus.

In Northern Pacific Ry. Co. v. United States, 330 U.S. 248, 255, 67 S.Ct. 747, 751, the Supreme Court spoke in terms of the shipments having been "destined to serve military or naval needs." Likewise, in United States v. Powell, 330 U.S. 238, 247, 67 S.Ct. 742, 746, decided the same day, the court stated: "It is sufficient here to say that the fertilizer was

"XIII. There is very little indication in the record that any of the property covered by the requisitions enumerated in subdivisions 1, 2, 3, 4, 5, 6, 7 and 8 of paragraph X ultimately was used on or near the battleground or that any of the products of any of the machinery ever were devoted to use against the common enemy. Defendant did not prove that any single article shipped or any single article or product of these machines actually was devoted to a war use."

 It is a general principle of transportation law that tariff rates must be determinable at the time the shipment is made. Sonken-Galamba Corp. v. Union Pacific R. Co., 10 Cir., 145 F.2d 808, 812.[6] This principle has been given application in numerous cases involving the precise land-grant rate problem with which we are here concerned.[7] It is

being transported for a 'civil' use within the meaning of § 321(a), since it was *destined for use* by civilian agencies in agricultural projects. * * *" (Emphasis supplied.)

In Southern Pacific Co. v. Defense Supplies Corp., D.C., 64 F.Supp. 605, 607, affirmed, 9 Cir., 161 F.2d 56, the district court examined the nature of the "contemplated" use of the property. In affirming, this court said (page 60) that "little importance is to be attached to the fact that 13.4% of raw material purchased primarily for the prosecution of the war, happened eventually to be manufactured into products sold for civilian uses pursuant to allocations by the War Production Board. * * *"

In Southern Pacific Co. v. United States, 67 F.Supp. 966, 968, 107 Ct.Cl. 167, the court considered that th· controlling fact was that the "reason' the shipments were for delivery to the Republic of China was that they were *intended* for military and not for civil use." (Emphasis supplied.) In Pennsylvania Railroad Co. v. United States, 125 F.Supp. 233, 237, 129 Ct.Cl. 781, the governing fact was held to be that the plywood in question was requisitioned on British lend-lease requisitions "showing the *intended* use of the plywood to be for military purposes. * * *" (Emphasis supplied.)

therefore our opinion that property moves "for military or naval and not for civil use," within the meaning of § 321 (a), if that was the intended use at the time the shipment was made.

Since the actual use to which such materials are put may not be the same as the intended use when they were shipped, proof of the one does not tend to prove the other. It follows that the lack of proof that the property here in question was actually put to a military or naval use is immaterial, and should not have been taken into consideration by the trial court.

The trial court stated no precise finding or conclusion as to the intended use of this property at the time the shipments were made. We will assume, however, that in making the ultimate finding and conclusion that the property was not "moving for military or naval use," the court impliedly found and concluded that when these shipments were made it was not intended that the property would be devoted to such uses.

The Government questions both the factual and legal basis of this finding and conclusion.

The evidence pertaining to the specific intended use of the eight categories of freight in question consists of notations contained on the requisitions and the testimony of two Government witnesses.[8] There is no conflict in this evidence, which we summarize below.

(1) *Lumnite hydraulic cement.* The one requisition for this material lists as the intended use "Army and Navy." Another notation on the requisition indi-

cates that this cement was to be used in replacing oil refinery equipment which had been damaged or lost. Both General Faymonville and Mr. King testified in effect that the Russians represented to the United States that these oil refineries were to be used for the production of aviation gasoline, used only by military planes, with some by-products which were also to be used by the military. They testified that petroleum production in Russia was entirely devoted to military use, and that no capacity was available for civilian use.

(2) *Gasoline refining equipment.* There were two requisitions covering such equipment. There are no notations on these requisitions which provide evidence of intention, but the testimony of General Faymonville and Mr. King, referred to above, is equally applicable to this category.

(3) *Electric generators, generator sets, diesel engines, and generating stations.* There were eleven requisitions covering such equipment. With regard to the intended use, each of these requisitions contains the notation, "War industry," "War industry-U.S.S.R.," "For army and air force, U.S.S.R.," "Used in military plants," or "Used in military plants-U.S.S.R." Several of these requisitions contain the notation, "This equipment is covered by paragraph D–10 of the approved power program." Others recite: "This equipment is in accordance with the new approved power program."[9]

General Faymonville testified that in practically every case the erection of or conversion of Russian plants for the

---

**8.** One of these witnesses was Harry F. King, a petroleum engineer who had been the assistant superintendent of a Sun Oil Company refinery until December 1943. He then became Chief of the Process Section of the Petroleum Administration for War. The other witness was Brigadier General Philip R. Faymonville. He had served several tours of duty in the Soviet Union between the two world wars, and from 1934 to 1939 he had been the military attaché of the American embassy in Moscow. He was a member of the Harriman Commission to the

Soviet Union in 1941, the specific purpose of which was to determine the scope of Russian military needs. Thereafter he remained in Russia and served for more than two years as the Chief of the American Supply Mission to the U.S.S.R.

**9.** One of these requisitions recites: "The equipment under this order is to supply electric power to the recaptured regions in which electric power facilities have been severely damaged or completely destroyed, and to supply the re-established strategic points, such as railroad junctions, stations, depots, etc."

manufacture of combat items required power facilities which were then non-existent in Russia. The stationary and mobile power plants and power-plant equipment transported under these requisitions, according to this witness, were to provide power for such plants. He also testified that the words "war industry" and "military production" on requisition forms meant production of items of war. The supplying of electric power facilities to Russia, General Faymonville stated, was to enable Russia to manufacture its own military items. This was considered preferable to having the United States ship the finished items.

(4) *Power plants and power stations and equipment.* There were fourteen requisitions covering equipment of this kind. Concerning intended use, each of these requisitions contained the notation, "War industry," "War industry-U.S.S.R.," "Army (U.S.S.R.)," or "Military production." Additional notations on some of these requisitions indicated that such equipment was part of "the power program for shipment to the U.S.S.R." On one requisition it is stated: "These power stations are urgently needed for the railroads of the U.S.S.R." On several it is recited: "In accordance with request made for the third period under Item 5, Group 3." The testimony of General Faymonville, as noted under category (3), is equally applicable here.

(5) *Equipment for steel mills, including heating pits, steel channels, iron rolls, and heating elements.* Eight requisitions called for transportation of equipment falling into this category. The intended use, as noted on all but one of these requisitions, was "War industry-U.S.S.R." The remaining requisition carried the notation, "Military by the U.S.S.R. army." [10] . General Faymonville testified that approximately one hundred per cent of steel production in Russia was then

being devoted to war use, such as the manufacture of munitions and tanks.

(6) *Oil-drilling and coal-mining tools and equipment.* There were four requisitions dealing with items of this kind. Concerning intended use, these notations are to be found on the requisitions: "War industry-U.S.S.R.," "Army (U.S.S.R.)," and "Army of the U.S.S.R." One requisition also contains this statement: "This equipment is for use in mining raw materials for the U.S.S.R. war industries."

(7) *Caustic soda.* The three requisitions for caustic soda carry these notations as to intended use: "Army (U.S.S.R.)"; "To be used in petroleum refining, rubber reclaiming and soap manufacture." Mr. King testified that the nature of the salt content of the crude oil at all Russian plants was such that the electrical desalting had to be assisted by a preliminary use of caustic soda. A caustic wash was also necessary for final neutralization. Mr. King also testified that in reclaiming rubber for further processing one of the solvents used in the recovery process involved the use of caustic soda.

(8) *Bunker coal.* The two requisitions for bunker coal provide this information as to intended use: "Stock-piling at West Coast ports, to be used for bunkering Soviet vessels as needed." General Faymonville testified that Russian seaborne commerce for any purpose other than the carrying on of the war or the bringing in of supplies to directly support the movement of armies "was an unknown thing."

The undisputed evidence reviewed above indicates that all or practically all of the freight in question was intended to be used or consumed in constructing, repairing, or operating certain Russian plants and facilities. The dominant function of these particular plants, according

---

10. Other notations on various of these requisitions: "to compliment [sic] rail and structural mill"; "for the blooming, rail and structural mills"; "for the production of war materials"; "for rolling mill"; "to complete the installation of steel plants transferred from the now occupied South to the East of the U.S.S.R."; "urgently needed for furnishing industries engaged in important defense tasks in the U.S.S.R."; and "concerning the metallurgical program."

to this evidence, was to supply the needs of the combat forces of that country. If the findings of fact of the trial court represent to any extent a view that this was not the intended use of these materials, the findings are to that extent clearly erroneous.

The test to be applied in determining whether such intended use, as so described, was "military or naval and not civil," is succinctly stated in Northern Pacific R. Co. v. U. S., 330 U.S. 248, 254, 67 S.Ct. 747, 750, as follows:

> " * * * Military or naval use includes all property consumed by the armed forces or by their adjuncts, all property which they use to further their projects, all property which serves their many needs or wants in training or preparation for war, in combat, in maintaining them at home or abroad, in their occupation after victory is won. It is the relation of the shipment to the military or naval effort that is controlling under § 321(a)."

Applying this test, it was held, in the Northern Pacific R. Company case, that copper cable for use in the installation of degaussing equipment on a cargo vessel (a defense against magnetic mines), lumber for construction of a munitions plant, Marine Corps pontons, bowling alleys for a naval air base at Dutch Harbor, Alaska, and liquid paving asphalt for an airport necessary for national defense at Cold Bay, Alaska, were transported "for military or naval and not civil use." The court specifically held (330 U.S. at page 253, 67 S.Ct. at page 750): "Civilian agencies may service the armed forces or act as adjuncts to them."

Applying the same test as announced in the Northern Pacific case, it was held in United States v. Powell, 330 U.S. 238, 67 S.Ct. 742, that fertilizer being transported to Great Britain under the lend-lease program for use by civilian agencies in agricultural projects was for "civil" and not "military or naval" use. The court was of the opinion (330 U.S. at page 247, 67 S.Ct. at page 746) that the fertilizer was

> " * * * not for use by the armed services to satisfy any of their needs or wants or by any civilian agency which acted as their adjunct or otherwise serviced them in any of their activities."

■■■ In our view, munitions plants and other industries, railroads, cargo ships, refineries, oil wells, and mines, the dominant function of which is to supply the needs of the armed services, are adjuncts to those services. As before stated, all or practically all of the freight in question was intended to be used or consumed by these Russian military or naval adjuncts. We therefore hold that the eight categories of freight under discussion were moved "for military or naval and not for civil use."

Appellee draws significance from the fact that here, as in Powell (where the railroads prevailed), the freight moved under a lend-lease program. It is of course true, as that case established, that the fact that a lend-lease program is involved is not enough to categorize the freight in question as intended for military or naval use. The standards of the Lend-Lease Act, as the court there pointed out (330 U.S. at page 244, 67 S.Ct. 742) are not to be imported into the Transportation Act.

But the court did not there hold that materials moving under a lend-lease program could not be for military or naval use within the meaning of § 321(a). Nor did it there rule that the manner in which materials are classified in lend-lease reports to Congress is controlling with regard to the application of § 321(a) in classifying lend-lease freight. The contrary is to be implied from the court's statement that the standards of the one act are not to be read into the other.

It is our conclusion on this branch of the case that the Government was entitled to land-grant rates on the shipments to which reference has been made.

This brings us to a consideration of the questions relating to the matter of export rates.

 The Government contends that shipments made under twenty-two bills of lading were entitled to move under the rates set out in the export tariff rather than under the higher rates of the domestic tariff. The export tariff rates were published in Trans-Continental Freight Bureau West-Bound Export Tariff No. 29-Series. This tariff, which was in effect at all relevant times, established export commodity rates from designated points within the United States to Pacific Coast ports. It was applicable on traffic destined for shipment by ocean common carrier to points west of the 170th Meridian, West Longitude, and east of the 30th Meridian, East Longitude.

The applicability of these rates was subject to compliance with numerous conditions set forth in Items 235 and 270 (a) of the tariff. One of these conditions was that the specific destination beyond the Pacific Coast port of export had to be shown in the bills of lading or the shipping receipts at the time of shipment.[11] It was the position of the railroad that this condition was not met. The Government took the opposite view.

For the purpose of court determination of this dispute, the parties agreed that government bill of lading DA–TPS–281224 is representative of all the bills of lading. They stipulated that the court's decision on the applicability of the Tariff No. 29-Series to this one representative bill of lading would be controlling on the other twenty-one bills. In this bill of lading, the words "Portland, Oregon" are typed in a blank space over the printed word "Destination." In a space under the printed word "Marks," these words and figures are typed in:

"PROCUREMENT
DIVISION CONTRACT #
AMTORG SYRIOIMPORT

ORDER # 52/LL 42108
TRANSPORT # 49514
U.S.S.R.
REEL # 1 TO 5 AND
28 TO 43 INCL."

The court sustained the position of the carrier, holding that the Government failed to establish that it was entitled to export rates. This determination was based upon the following recital, which, although denominated a finding of fact, is essentially a conclusion of law:

"XX. The defendant failed to comply with the provisions of Item 270(a) of TCFB Export Tariff No. 29-Series because the specific destination or destinations beyond the Pacific Coast port of export were not shown in any of the bills of lading above enumerated issued at the time of shipment. The notation 'U.S.S.R.' under 'Marks' on each of said bills of lading was not a showing of specific overseas destination."

Pointing out that the term "specific destination," as used in Item 270(a), is not defined in the tariff, the Government argues that, considering the purpose to be served, the "U.S.S.R." notation under "Marks" fulfilled the condition in question.

The purpose intended to be served by this condition was fully explored by the Interstate Commerce Commission in War Materials Reparation cases, 294 I.C.C. 5, 43–44. The commission held that this condition was imposed to enable the railroad to identify transcontinental traffic as in fact tendered for movement to the claimed overseas destination, help prevent the application of export rates to shipments that would move freely on the higher domestic rates, minimize or prevent delay or congestion, keep track of the through movement, enable the assessment of the correct export rate, facilitate compliance with United States customs

11. This condition in the tariff reads as follows:
"Item 270(a) Rates authorized apply only to export traffic when specific destination beyond Pacific Coast port of export is shown in bill of lading or shipping receipt issued at time of shipment * * *."

and other government regulations, and expedite handling through the port.

In contending that all of these purposes were met by use of the notation "U.S. S.R." under the heading "Marks," the Government argues that this notation necessarily meant some Soviet port on the Pacific Ocean. The Government then points to the undisputed evidence that all Soviet Pacific ports to which the shipments could have been exported are west of the 170th Meridian, West Longitude, and east of the 30th Meridian, East Longitude. Under the export tariff, freight destined for points beyond those limits was entitled to the export rate. The Government therefore urges that the notation in question supplied all information needed to fulfill every purpose which the tariff condition was designed to serve.

Opposing the Government's position, the carrier calls attention to the fact that the notation "U.S.S.R." does not appear over the printed word "Destination," but under the heading "Marks." The words which were typed in over "Destination" were "Portland, Oregon." Accordingly, the carrier argues, the notation "U.S. S.R." did not conclusively establish that the destination of the shipments was the U.S.S.R. In this connection, the carrier asks us to take judicial notice of the fact that a substantial part of the supplies given to the Soviet Union during World War II under lend-lease were delivered and accepted in this country. Examples of such supplies, the carrier states, are coal and oil which were used for refueling Soviet ships in American ports.

We find no significance in the fact that the notation on which the Government relies appears under the heading "Marks," instead of over the word "Destination." The tariff condition in question does not require that the notation as to specific overseas destination be shown at any particular place in the bill of lading. Moreover, such a notation could not appropriately have been made over the word "Destination," since that space was reserved for information as to the destination of the rail transit.

The argument that judicial notice should be taken that supplies going to Russia under lend-lease were sometimes delivered and accepted in this country is not convincing. It may be, as urged, that coal and oil were sometimes so delivered and accepted. But we have no basis for taking judicial notice that armored, lead-covered, copper electric cable (the commodity which was shipped under the representative bill of lading) was ever delivered and accepted in this country.

In any event, the "U.S.S.R." notation entered under "Marks" excludes such a possibility as to this freight. That notation apprised the carrier that each of the boxes in which the cable was packed had a destination marking of "U.S.S.R." This could only mean that the cable was to be exported to that country after the rail movement terminated at Portland, Oregon. This information is further confirmed by the notation "For Export" which appears at another place in the bill of lading.

About the only ground that is left for holding the "U.S.S.R." notation insufficient is that "specific destination," as used in the tariff, means port as well as country, and failure to designate a port constitutes noncompliance with the conditions. The Court of Claims so ruled in Union Pacific R. Co. v. United States, 132 F.Supp. 230, 248, 132 Ct.Cl. 213. In that case, it was specifically held that the notation "U.S.S.R." under "case marks" was not a designation of "specific overseas destination."

In the decision to which reference has just been made, no reason is stated why the undefined tariff term "specific destination" necessarily and under all circumstances requires designation of a port instead of a country. There was little excuse in that case, however, for the failure to designate a specific overseas port. The commercial uniform through export bill of lading there used provided a space for insertion of the rail destination and the overseas "port" destination of the shipment. The government bill of lading form used here did not provide

.a space expressly designed for insertion ·of the overseas "port."

In our view, the tariff condition requiring a showing of "specific destination beyond Pacific Coast port of export" is satisfied where it is noted in the bill of lading that the cases are marked for export to a foreign country all ports of which are beyond the limits set out in the ·export tariff. Every purpose intended to be served by the condition is then satisfied. The "U.S.S.R." notations made on these bills of lading satisfy this requirement. There is no contention that the ·export rate is not otherwise applicable, or that failure to designate a particular Soviet port has prejudiced the carrier in any respect.

The judgment is reversed.