UNITED STATES of America, Appellant,

v.

ASSOCIATED AIR TRANSPORT, INC., Appellee.

ASSOCIATED AIR TRANSPORT, INC., et al., Appellants,

v.

UNITED STATES of America, Appellee.

No. 17607.

United States Court of Appeals Fifth Circuit.

March 8, 1960.

---

7. See Citizens National Trust & Savings Bank v. Welch, 9 Cir., 119 F.2d 717.

Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., James L. Guilmartin, U. S. Atty., Miami, Fla., Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., for appellant.

William C. Burt, Robert Matthew Beckman, Washington, D. C., Joseph A. Perkins, Jeptha P. Marchant, Miami, Fla., for appellee.

Before RIVES, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case involves domestic air transportation of military personnel during the Korean defense emergency by chartered air carriers. The immediate question is whether the Government is liable for ferry miles actually flown but which were in excess of the mileage specified in charter bids. Underlying that is the construction and application of the filed tariff. And collateral to this is the question of the right of the Government to invoke equitable estoppel against the Carrier's collecting payment on the basis of the filed tariff.

In a figure indigenous to the case, the District Judge, affirming completely the special master's report,[1] steered an instrument course somewhere between that diversely plotted by the Carrier and the Government. He held straight on the beam, as he was obviously bound to, that the tariff was valid and applicable. But then followed some diversions apparently to avoid apprehended inequitable turbulence. For he held that in order for the Carrier to recover for ferry mileage flown in excess of that bid, the Carrier had to show that, when the bids were received and evaluated, the Government knew that the ferry mileage was estimated only. The question of *fact* of such knowledge produced another departure. For he determined that the Government did not have that knowledge prior to June 25, 1953. After that date, due to the new requirement that supporting data accompany all billings for completed charter flights, the Government knew generally that ferry mileage bid was an estimate only.

This satisfied no one, and all appeal.[2] We conclude that the District Court's flight plan was faulty and reverse.

1. The hearings before the special master (called a Commissioner) were extensive covering approximately 40 days with 2400 pages of testimony, several hundred numbered exhibits, some of which were mere numbers identifying further cartons and boxes of unnumbered papers. The Commissioner's Report, undoubtedly the product of much lucubration, Livesay Window Co. v. Liveway Industries, 5 Cir., 1958, 251 F.2d 469, 470, is an exceptional piece of work, well organized, complete and self-explanatory. It alone comprises 224 pages of the printed record. The Commissioner's fact findings, adopted by the District Court, are not here challenged. Indeed, prepared and first filed as a proposed report under F.R.Civ.P. 53(e) (5), 28 U.S.C.A., it is so constructed that many crucial fact findings are expressly described as "finding on which the parties are in agreement." The closest, and only attack on fact finding or fact inference is the Government's specification of error No. 2:

"2. The District Court erred in holding that a requirement by the Government that billings for past charter flights be supported by documentary proof that the ferry mileage claimed had actually been flown is sufficient to charge the Government with specific knowledge that the ferry mileage was not accurately stated in the carrier's bids for subsequent charter contracts."

2. Associated's claims comprise 154 commercial air movements (called CAM's). Of its total claim of $50,353.40 the Court allowed $16,479.55. The Government counterclaimed as to 134 CAM's for ferry mileage bid and charged for but not actually flown. Of its total counterclaim of $38,213.33 the Court allowed $20,843.93. This resulted in a net award to the Government of $4,364.38.

## I.

Associated is an irregular air carrier. In 1951 it, along with others, was authorized by the Civil Aeronautics Board to provide common carrier charter service to the military without limit as to frequency or schedules. This, the Government's brief candidly tells us, was to "help satisfy" the "sharply increased need for domestic transportation" with which "the armed forces were faced" because of the "expansion of the National Defense Program following the outbreak of the Korean hostilities." Thereafter Associated and others through their agent IMATA[3] entered into joint agreements[4] with the several armed services which prescribed the procedure for making the individual charters for commercial air movements (called CAM). The Joint Agreements provided that charges were to be computed in accordance with tariffs mandatorily filed with CAB. The tariff, discussed later in detail, prescribed specific mileage rates for charter (live) miles (while the plane was carrying passengers) and ferry miles (while ferrying empty prior and subsequent to the passenger carrying leg).

Individual charter contracts were set up this way. The military post or base requiring transportation made its needs known to its service headquarters at the Pentagon. The service transportation office would then request bids from the agents, such as IMATA, representing air, rail and bus carriers. The bids submitted for air carriers identified the particular carrier and aircraft. Further, they set forth the points of origin and destination, both for ferry flights and the charter (live) flight together with the respective mileages. The dollar cost shown on the bids was the sum of the ferry mileage charge (front and rear ferry miles multiplied by tariff rate for ferry miles) and the charter mileage charge (charter miles multiplied by tariff rate for charter miles).[5]

The bids were evaluated on a comparative basis by the service and a charter was awarded to the carrier best meeting the needs of the military. Comparative cost was a factor, but only a factor. After performance of the transportation, a charter certificate was presented by IMATA to the service for verification and comparison with the bid. After being approved, the certificate was presented to the disbursing officer who paid the carrier subject to post-payment audit by the General Accounting Office and possible refund pursuant to 49 U.S.C.A. § 66 (1952).

Indeed, it was at the GAO where the carrier ran into heavy weather. Almost from the beginning of the operation the GAO took the position which the Department of Justice still asserts here: (a) for ferry miles actually flown in *excess* of the bid, the bid controls; (b) for ferry miles actually flown *less* than the bid, the bid is disregarded, and actual mileage alone counts. The District Court's action only complicated it further. The Court agreed with (b) and ordered the refunds on the Government's cross claim. As to (a) it established a ceiling of June 25, 1953. On all CAM's prior thereto, it agreed with the GAO that the bids set the maximum charge; on those subsequent it disagreed with the GAO and

3. IMATA was one of three competing associations authorized by CAB to represent air carriers in arranging military charters. The others were ATA (Air Transport Association) and ACTA (Air Coach Transportation Association).

4. These were Joint Military Irregular Air Transport Agreements Nos. 1 and 2.

5. An example will help. On request for charter movement of passengers from San Antonio to Memphis, the charter miles referred to this leg. If the bid showed the plane to be at El Paso and to be returned to New Orleans for its next operation, *front* ferry mileage would be shown separately for El Paso to San Antonio and *rear* ferry mileage Memphis to New Orleans.

The difficulties presented here arose when the actual front ferry leg flown was, e. g., from Albuquerque (not El Paso) to San Antonio, i. e., a greater distance, and the rear ferry leg was to Nashville (not New Orleans), i. e., a lesser distance, or other combinations of actual greater or lesser front, rear or combined ferry miles.

agreed with the carrier that the ferry mileage bid was an estimate only.

## II.

The tariff is, as all recognized, crucial. Because each of the parties emphasizes one rather than the other, of various pertinent sections, it facilitates easy reference in our discussion to set them out separately, but in the order they appear in the tariff. By reading the notes (6 to 13) together, as must be done, the whole tariff can likewise be sensed. After limiting it to carriers participating in the tariff and defining miltary traffic and transportaton covered,[6] the tariff set forth the definition of "charterer,"[7] "charter flight," [8] "charter miles," [9] "ferry miles,"[10] "application of rates and charges,"[11] "computation of mileage" for charter mileage [12] and ferry mileage.[13]

■■■ Filed as it was under compulsion of § 403(a) of the Civil Aeronautics Act of 1938, the tariff carried the statutory mandate of § 403(b) that it and it alone was to be the sole standard for services to be rendered and charges assessed and collected.[14] In the implemen-

6. "Application of the Tariff:
 "This tariff is published and filed * * on behalf of the following participating carriers * * * for the provision of air Transportation under [CAB] Order No. E–5166, dated March 21, 1951, pursuant to contracts with departments of the military establishment and of uniformed military personnel traveling at their own expense to or from military bases designated by departments of the military establishment."

7. "Charterer: means a person, group of persons, firm, partnership, association, corporation or body politic acquiring,
 [1] at a fixed charge,
 [2] the use of an aircraft operated by Carrier for
 [3] the transportation of persons
 [4] from a specified origin to a specified destination or
 [5] for a particular itinerary,
 [6] agreed upon in advance."
 Note: brackets inserted.

8. "Charter Flight: Means air transportation and identical service furnished by a carrier to a charterer in a chartered aircraft beginning at the time the chartered aircraft is made available for occupancy or loading at origin and ending when the chartered aircraft is unloaded or discharged at destination."

9. "Charter miles: Means miles which chartered aircraft is operated by carrier for Charterer, carrying passengers."

10. "Ferry Miles: Means miles which Carrier is required to operate an aircraft without payload between points where it is based by the Carrier and the origin of a charter flight and between the destination of a charter flight and the point to which the aircraft is to be returned for the next operation by the carrier * *."

11. "(A) General: The charges published in this Tariff are subject to availability of aircraft and shall apply only in connection with the aircraft operated by the Carrier as a common carrier for compensation or hire for the air transportation of military traffic in accordance with Civil Aeronautics Board Order Serial No. E–5631 dated August 21, 1951."

12. "(A) Charter Mileage Determination:
 "(1) Air miles will be determined by reference to Military Traffic Tariff No. 5, C.A.B. No. 6, * * *
 "(2) When the source in paragraph (1) above does not provide the necessary mileage between airports of origin and airport of destination then reference will be made to * * * 'Airline Distances Between Cities in the United States', Special Publication No. 238, U.S. * * * Coast and Geodetic Survey.
 "(3) When the source in paragraph (2) above does not wholly provide the necessary mileage then reference will be made to Coast and Geodetic Survey Charts for the additional airway mileage."

13. "(B) Ferry Mileage Determination:
 "(1) Air miles will be determined by reference to the Government publication titled 'Airline Distances Between Cities in the United States', * * * U.S. Coast and Geodetic Survey.
 "(2) When the source in paragraph (1) above does not wholly provide the necessary mileage then reference will be made to Coast and Geodetic Survey Charts for the additional airway mileage."

14. § 403(a), 49 U.S.C.A. § 483(a) (1952 ed.)
 "Every air carrier and every foreign air carrier shall file with the Board * * * tariffs showing all rates, fares, and charges for air transportation between points served by it * * *."
 § 403(b), 49 U.S.C.A. § 483(b) (1952 ed.)
 "(b) No air carrier or foreign air carrier shall charge or demand or collect

tation of this stringent legislative policy, the courts have been equally emphatic that the basis for the charge or credit must be found in the tariff. If it is not in the tariff, it is not allowable. It is not a mere matter of contract. For "a rate once regularly published is no longer merely the rate imposed by the carrier, but becomes the rate imposed by law." Louisville & N. R. Co. v. Dickerson, 6 Cir., 1911, 191 F. 705, 709. "Such tariffs, at least those which are factors in determining the carrier's charges, have the force and effect of statutes." American Ry. Express Co. v. American Trust Co., 7 Cir., 1931, 47 F.2d 16, 18. The tariffs are both conclusive and exclusive; they may not be added to through reference to outside contracts or agreements or understandings or promises.[15]

■■■■■ As a natural corollary to such a dynamic policy prohibiting the possibility or temptation to preferential discrimination—frequently asserted by the sov-

ereign in the punitive enforcement of the Elkins and similar Acts—is the equally uncontradicted legal proposition that estoppel cannot be invoked against a common carrier to avoid a tariff provision. "Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay." Kansas City Southern Ry. Co. v. Carl, 1913, 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683, 688. It is clear that no "act or omission of the carrier" can "estop or preclude it from enforcing payment of the full amount" of the tariff charges, Louisville & N. R. Co. v. Central Iron & Coal Co., 1924, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900, 902. And "equitable considerations may not serve to justify failure of carrier to collect, or retention by shipper of, any part of lawful tariff charges," Baldwin v. Scott County Milling Co., 1939, 307 U.S. 478, 485, 59 S.Ct. 943, 948, 83 L.Ed.

or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares, and charges specified in its currently effective tariffs; and no air carrier * * * shall, in any manner or by any device, directly or indirectly, or through any agent or broker, or otherwise, refund or remit any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities, with respect to matters required by the Board to be specified in such tariffs, except those specified therein. * * *."

Section 403 of the Civil Aeronautics Act of 1938 was applicable at the time. This section has now been superseded by § 403 of the Federal Aviation Act of 1958, 49 U.S.C.A. § 1373.

This rounds out a consistent statutory policy covering all modes of interstate transportation. Railroads: 49 U.S.C.A. §§ 6, 8, 9, 41-43; Motor Carriers: 49 U.S. C.A. §§ 317, 318, 322; Water Carriers: 49 U.S.C.A. §§ 906, 916, 917. The stringency of the Elkins Act, 49 U.S.C.A. §§ 41-43, and its counterparts for Motor and Water Carriers of imposing severe criminal penalties has an airborne application as well. See 49 U.S.C.A. § 1472(a) and, specifically, (d).

"(d) Any air carrier * * * or any officer, agent, employee, or * * * who

shall, knowingly and willfully, offer, grant, or give, or cause to be offered, granted, or given, any rebate or other concession in violation of the provisions of this chapter, or who, by any device or means, shall, knowingly and willfully, assist, or shall willingly suffer or permit, any person to obtain transportation or services subject to this chapter at less than the rates, fares, or charges lawfully in effect, shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be subject for each offense to a fine of not less than $100 and not more than $5,000."

15. See among countless cases: Southern Ry. Co. v. Prescott, 1916, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836; Texas & P. R. Co. v. Mugg & Dryden, 1906, 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011; Armour Packing Co. v. United States, 1908, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681; New York Cent. & H. R. R. Co. v. United States, 1909, 212 U.S. 500, 29 S.Ct. 309, 53 L.Ed. 624; Davis v. Cornwell, 1924, 264 U.S. 560, 44 S. Ct. 410, 68 L.Ed. 848; Chicago & Alton R. Co. v. Kirby, 1912, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033; Gulf, Colorado & Santa Fe R. Co. v. Hefley, 1895, 158 U.S. 98, 15 S.Ct. 802, 39 L.Ed. 910; Jones v. Northwest Airlines, 1945, 22 Wash.2d 863, 157 P.2d 728; Whittenberg v. Eastern Air Lines, D.C.E.D.S.C.1954, 126 F. Supp. 459.

1409, 1414. Pittsburgh, C., C. & St. L. Ry. Co. v. Fink, 1919, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151.

### III.

The Government does not really challenge this, as indeed it could not. Rather, accepting these propositions its contentions are twofold. First, the tariff contemplates reference to an outside standard, namely, the bids. Second, if not, then the asserted estoppel arises not because of representations or misrepresentations of the terms of the tariff. Rather the estoppel comes into play because of representation of matters outside the tariff and incapable by their nature of being a part of it, namely, points of ferry mile origin and destination. To discuss the first means inevitably that we simultaneously consider Associated's basic contention that the tariff is sufficient, exclusive, and contemplates actual ferry miles flown, whether more or less than bid.

Underlying the Government's delicate process of intrinsic construction of the tariff is the assertion that, as a legal proposition, the tariff, to be valid and effective, must enable a prospective user at the time of shipment to calculate to the last penny the charges which will be payable if the service is employed. On that foundation, it then proceeds to demonstrate that since points of origin and destination for front and rear ferry legs are not shown in the tariff,[16] nor can they be, it is obvious that the tariff itself affirmatively contemplated the use of "outside" material, i. e., the bid, to supply these missing essentials. Instead, then, of the bid being an external to the tariff, it was very much a part of it although, from the nature of things, mechanically expressed outside of it.

But what is urged as a foundation to an articulate edifice turns out to be the proverbial, and insubstantial, house of cards. For there is no such legal requirement as to the sufficiency of a tariff. The general goal of a tariff is, of course, that it is a statement by the carrier that "it will furnish certain services under certain conditions for a certain price." Union Wire Rope Corp. v. Atchison, T. & S. F. Ry. Co., 8 Cir., 1933, 66 F.2d 965, 966. And to accomplish this "they must be expressed in clear and plain terms, so that those dealing with and governed by them may understand them and act advisedly." Atlantic Coast Line R. Co. v. Atlantic Bridge Co., 5 Cir., 1932, 57 F.2d 654, 655.

If this contention of the Government of a requirement of preshipment calculation of exact cost were as universal as claimed, an abundant jurisprudence would readily be found to evidence its existence. But its protagonist is hard put to find precedential support. Indeed, the assertion rests on a single quotation from a single case that "it is a general principle of transportation law that tariff rates must be determinable at the time the shipment is made."[17] That Court hardly invested its words with the sweeping meaning now claimed. On the contrary, the action taken recognizes that in essential respects what is payable frequently depends on outside facts—facts which have to be established.

Liability for payment of transportation charges depends solely on the tariff. As New York Central & H. R. R. Co. v. York & Whitney Co., 1921, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016, and Louisville & Nashville R. Co. v. Maxwell, 1915, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853, and others so vividly illustrate, it is im-

16. The argument that § 403(a), note 14, supra, requires that the tariff state the fares and charges "between points served by it" misses the whole point. These are *irregular* carriers, engaged under CAB Economic Regulations, Part 292.1, Reg. Ser. No. 388, 12 F.R. 3076 (1947), in regular, i. e., unscheduled, service as to time and points of origin and destination. To satisfy any such artificial require-
ment, the carrier would have to attach an Atlas of the United States.

17. United States v. Spokane, P. & S. Ry. Co., 9 Cir., 1958, 261 F.2d 681, 684. That case merely determined that applicability of land grant rates depended, not on ultimate use, but upon the intended military use of the cargo at the time the shipment was made.

material whether or not the shipper has accurate knowledge of the charges in advance of shipment. The tariff must furnish the standard upon which the total charges are to be computed on the basis of the actual facts then or subsequently established. It is not essential to a valid tariff that it, alone or by incorporation by reference, afford the tools to a shipper to then and there calculate his dollar cost before shipment is made.[18]

## IV.

Freed of the necessity of the tariff affording itself or by incorporated standards the means of advance, precise calculation of transportation charges, we come to the construction of this tariff.

 In this, both the Government and Associated are too preoccupied with the tariff definition of "charterer," note 7, supra. Each engages in a verbalism emphasizing now one, now the other, word or phrase or sentence too much in disregard of the principle that the tariff is to be construed as a whole. Associated, for example, contends that this refers only to the "live" (charter) flight on which passengers are carried. The District Court agreed with Associated's alternative contention. We do not, but we consider this of no significance.

The Government, though, builds its case principally on this single provision. The argument seems to be that since charges may be collected only for a char-

ter, what is a charter is determined by *who* the charter*er* is. This leads the Government to read as indispensably locked together Clauses [1], [2], [4], [5] and [6] as identified in note 7, supra. A charter, then, is an arrangement by which one acquires "[1] at a fixed charge, [2] the use of an aircraft operated by a Carrier * * * [4] from a specified origin to a specified destination or [5] for a particular itinerary, [6] agreed upon in advance." Then the argument gains altitude to conclude that since the [4] origin and destination or an [5] itinerary must be [6] agreed upon in advance, the phrase "miles which Carrier is required to operate an aircraft" as found in the tariff definition of "ferry miles," note 10, *supra*, obviously contemplates that there must be a firm, fixed agreement in advance on the geographical point at which the front ferry miles commence and the rear ferry miles terminate.

We reject this intricate construction. In doing so we can agree with the Government, and hence disagree with Associated, that [2] "the use of an aircraft operated by Carrier" [3] "for the transportation of persons" does not confine the status of charterer to the passenger carrying leg. But recognizing that one is a charterer with respect to the deadhead legs as well, this definition of charterer, neither alone nor in conjunction with the balance of the tariff, is deter-

---

18. The practical complex variables of modern transportation would work against that. For example, in rail transportation demurrage on cars is payable for delay in excess of the "free" time. The tariff prescribes the "free time," the rate of demurrage. The amount can only be fixed by proof of time of delivery and return of the cars. In water carriage under Part III, 49 U.S.C.A. § 901 et seq., the tariff would prescribe salvage and general average to be payable by cargo under York-Antwerp or other appropriate rules. But ultimate liability or its amount would depend on the occurrence of an incident giving rise to general average or salvage, a legal determination of that fact, and a determination of contributory values and amounts. See, e. g., United States v. Atlantic Mutual Ins. Co.

(Logan), 1936, 298 U.S. 483, 56 S.Ct. 889, 80 L.Ed. 1296, 1936 A.M.C. 993; Prudential S.S. Corp. v. United States, 2 Cir., 220 F.2d 655, at pages 658–659, 1955 A.M.C. 990, at pages 994–995. Liability for additional payments might depend on protracted litigation. See, e. g., United States v. Atlantic Mutual Ins. Co., 1952, 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907, 1952 A.M.C. 659. Likewise, chartering a vessel constitutes contract carriage requiring the establishment and adherence to minimum rates, etc., 49 U.S.C.A. § 906(e). Under traditional charters, the total amount payable by shipper-charterers would depend on time (in a time charter), cost of fuel, port and other charges, stevedoring, etc. See Gilmore & Black, The Law of Admiralty, 170 et seq. (1957).

minative of mileage or charges. Its function was to make the essential distinction between a party using a planeload service and passengers booked individually.

▉▉▉▉▉ What was to be payable by one in the defined status of a charterer for a charter flight (defined, note 8, *supra*) was to be determined by applying the respective mileage rates. These were specified in the tables for "charter miles," note 9, *supra*, and for "ferry miles," note 10, *supra*. The tariff is self-sufficient and needs no extraneous agreements or standards. No bid (or acceptance of it) was necessary to determine charges for the passenger leg. This depended upon facts as to (a) the point of origin and destination as a matter of geography, and (b) computation of mileage on the criteria specified, note 12, *supra*. The ferry legs, front and rear, were specified with equal definiteness. For the front ferry leg it was the "miles which the Carrier is *required* to operate an aircraft * * * between points where [the aircraft] is based by the Carrier and the origin of" the passenger leg. For the rear ferry leg it was the miles "between the destination of" the passenger leg "and the point to which the aircraft is to be returned for the next operation by the Carrier." (Emphasis added.) This standard is mechanically self-executing once it is determined (a) where the aircraft *is* based preceding the performance of the charter, (b) the point at which the pas-

senger leg commences and (c) terminates, and (d) the point at which the Carrier's next operation is to commence. In such analysis it is, of course, essential that the facts show that the carrier was "required to operate" the aircraft between those points to perform that charter.

Contrary to the contentions of the Government, the element of "required" does not give the carrier a blank check. It is not a license to base a charge on a ferry leg not actually essential. The term is to be given a sensible meaning in the context of actual necessity in an operational sense: e. g., the passenger leg is to commence at San Antonio; in order to pick up and carry the passengers, the plane must first go from El Paso where "it is based" to San Antonio. This does not permit dog-leg flights which prolong the front or rear ferry distance; nor front or rear flights made primarily to secure maintenance. The District Court, on evidence not attacked by any party, disallowed [19] specific claims of Associated, as would we, because these miles flown were not required to perform the charters—they were done for other reasons.

In the face of an extensive record whose fact findings are unchallenged on this score, it begs the question for the Government to now assert that a ferry leg was not "required" because the Carrier ought not to have accepted subsequent bids which would place the aircraft

19. The District Court disallowed, and we approve, as "not required" the following groups of CAM's:

Dog-leg: Group Nos. 3, 4, 5, 6 (in part) and 7 (passengers aboard but disallowed as dog-leg).

Maintenance: Group Nos. 9a, 9b and Government's counterclaim 15.

The Court allowed Associated to recover Group 11 for crew training flights as the crew training was incidental to the required ferry legs. Of these special types of claims disallowed by the District Court, we disagree only as to two. The first is Group 8 "Passengers Prior to 6/25/53." The only basis for disallowance was lack of knowledge which we hold to be immaterial. It will now be recoverable along with Group Nos. 1a, 1b, 1c which were also disallowed solely for

lack of knowledge. The Court, on ample basis, held that these "passengers" in Associated's claim Group 8 and the Government's counterclaim Group No. 16 were mere hitchhikers. The second is Group 10 "Commercial Common Carriage." The Commissioner held that while the mileage was actually flown it preceded or followed commercial, i. e., non-military, flights. This fact did not alter the application of the tariff, note 10, supra, as to the place where the aircraft was or was next to be used. It should be treated as did the Commissioner on Counterclaim Group 14. The groups finally allowed and disallowed, identified as they were in the Commissioner's report, are recapitulated in note 33, infra.

at front and rear points other than stated in the initial bid. If the bid is not a part of the tariff, it has nothing to do with the tariff element of "required." If the bid controls, then the tariff element "required" becomes superfluous. And in any event, the suggestion ignores the practical problems reflected by this record. Transportation was in critical short supply. Bids were solicited usually four or five days in advance, but sometimes as long as a month. In the meantime, flights were sometimes cancelled by the Government and in other instances intervening bids actually reduced ferry mileage.[20] The last thing the Government wanted was for a carrier to immobilize a plane pending acceptance of a bid and commencement of performance of that charter. The familiar pattern of an urgent exploitation of critical transportation in the defense emergency is reflected by the findings agreed to by both parties. The Court found that "between the time a bid would be submitted to one military agency on a particular flight another CAM would sometimes be open for bids by that or another military agency involving points in another part of the country." And apart from the knowledge the Court imputed to the Government by reason of the billing changes of June 25, 1953, the Court made the critical (and agreed) finding that "the military agencies generally knew or ought to have known that the carrier representatives in many instances estimated the origin and destination points for the ferry mileage." [21]

■■■ The result is that we agree with Associated that the tariff is wholly sufficient and the matter of the Government's knowledge either before or after June 25, 1953, that front and rear ferry points were merely estimated is immaterial. We do, however, consider it appropriate, in the event of further review, that we simply state that if this knowledge were material, we do not agree with the District Court that either flight plans routinely filed or claims, papers and supporting documents filed with the GAO through the reimbursement routine after June 25, 1953, would suffice.

## V.

■■■ In assaying the Government's alternative contention that Associated is estopped from collecting the tariff charge, the construction of the tariff urged by Associated and adopted by us must be taken to be correct. In view of the clear state of the law which forbids any variation from tariff charges by estoppel or otherwise, discussed at length in Part II above, the Government encounters considerable difficulty in sustaining this defense. Indeed, its brief categorically states that it "does not claim an estoppel against the terms of the tariff." Rather, the "estoppel it invokes * * * is an estoppel against repudiation by the carrier of the representations by which it induced the award of the charter contracts on which it sues. Having obtained the charter by a representation to route its aircraft from a certain point to a certain point, Associated was bound in equity and good conscience to perform."

In our approach we need not determine whether, since the representation concerns a future event, this would be a proper application of so-called promissory estoppel.[22] Nor need we determine, as urged by Associated, whether other elements of estoppel are present. Especially is that so in view of the uncontradicted finding that the military

20. Included in the Government's counterclaim recovery of $20,843.93 was the sum of $17,567.83 for ferry miles bid but not flown. Much of this saving in ferry mileage resulted from intervening CAM's.

21. These are findings 13 and 14 with the Commissioner's Report.

22. The Government urges among other authorities the following in support of its view. Annotations, Promissory Estoppel, 115 A.L.R. 152, 48 A.L.R.2d 1069; 1 Williston, Contracts, § 139 (Rev.Ed.); Boyer Promissory Estoppel: Requirements and Limitations, 98 U.Pa.L.Rev. 459; Fridman, Promissory Estoppel, 35 Canadian Bar Rev. 279; Restatement, Contracts, § 90.

services had knowledge of the practice of estimating ferry mileage.[23] See note 21, *supra*. Rather, it is our conclusion that the allowance of any such plea of estoppel under these circumstances would do violence to the clear legal prohibition and would frustrate the policies implicit in the law.

It matters not how thinly veiled or disguised, whether as an illustration of an asserted analogy to misrouting, S. W. Shattuck Chemical Co. v. T. & M. Transportation Co., 10 Cir., 1943, 134 F.2d 394, 395,[24] or a condition upon which the contract of transportation was induced as the Government's brief now puts it, the result would be to open wide the opportunity for rebates and favoritism of the kind which carrier regulatory statutes have long sought to stamp out.

On our construction of the tariff, the mileage "required" to be flown is determinable by actual operating factors. If, as is now urged under the enticing appeal of equity, mileage may be fixed by a collateral pretransportation agreement, the carrier would be compensated not for the actual services furnished, but on

what it said would be furnished and charged for. As an economic matter, all recognize that an air carrier must somehow be compensated for the ferry legs in order to carry out the passenger leg. That being so, a failure to pay for the ferry leg actually required is the furnishing of a free service by the carrier. From the standpoint of a regulated utility type business, that has two adverse implications. First, other shippers not so favorably situated are required to pay "more" to make up for the "free" service supplied by the carrier. Or they are at least entitled to a rate reduction if the level of charges are adequate to allow such "free" services. Second, it offers a convenient, workable, sophisticated and almost foolproof means of undercutting competition of other similar carriers and a simultaneous granting of preferential rebates to a favored customer in gratitude for increased patronage.

If this may be done when the sovereign is the shipper, it may be done where private parties are involved.[25] The short of it is that when Congress seeks to give

23. We would point out that just as the Government emphasizes that Associated, as a plaintiff, must prove each of the CAM's and all of the elements of a contract to recover, so must the Government establish all elements of its plea of estoppel, including detriment. So far as this record is concerned and accepting for the moment the making of the bid and the subsequent flying of ferry mileage in excess of that specified, it shows only that the Government *might* be called upon under our construction of the tariff to pay more than in equity it ought to have. But one pleading estoppel must show the detriment in fact. And for all we know many, if not all, of the excess charges were brought about by flight cancellations by the Government or the offering and acceptance of intervening bids. Likewise, had the actual points of origin been accurately stated, the Government would nevertheless have accepted the bid as a matter of military necessity. The burden to overcome these possibilities is indeed a heavy one, but that is the price of estoppel. 19 Am.Jur., Estoppel § 42.

24. That Court's statement, so much relied on by the Government, that the carrier "was duty bound to route them that

way, because it had contracted to haul them for this amount" creates an entirely erroneous impression. This case did not hold a carrier bound by an estoppel. Rather, it was a question of alternate routings under a valid tariff which prescribed alternative routings. It has nothing to do with our case.

25. Here the representation is as to the *location* of the aircraft or its next commitment. But representation could be made of other countless factors having a bearing on service or rates and hence final cost; e. g., weight or measurement of cargo, its classification, availability of cars, etc. It is now clear, of course, that "any stipulation attempting to alter the provisions as fixed by the published rules relating to any of the services" to be supplied by a carrier are likewise forbidden. Southern Ry. Co. v. Prescott, 1916, 240 U.S. 632, 638, 36 S.Ct. 469, 472, 60 L.Ed. 836, 839. See also Loomis v. Lehigh Valley R. Co., 1916, 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517; Lehigh Valley R. Co. v. United States, 1917, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839; Lowden v. Simonds-Shields-Lonsdale Grain Co., 1939, 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953.

the Government a preferred transportation status, it does so in plain terms.[26] In the meantime, Congress, enlightened by history and scandals of national proportions, has expanded its arsenal to combat these invidious[27] discriminations which like all fraud are "as versable as human ingenuity." Abbott v. United States, 5 Cir., 1956, 239 F.2d 310, 314. The trend is toward more, not less, stringent regulation. And as each new form of transportation comes under national regulation, almost the first thing done is to compel promulgation and filing of rates, charges, practices which alone may be charged and collected.[28]

As this is a device through which a carrier "directly or indirectly" could "extend to [a] person * * * privileges or facilities" other than as specified in the tariffs and to "refund or remit [a] * * * portion of the rates, fares, or charges," specified in the tariffs, it comes under the ban of § 403(b), note 14, *supra.* This is so quite without regard to the presence or absence of an unlawful or discriminatory motive in any of these CAM's.

### VI.

■ Indeed, while it did not have before it the precise question of the availability of estoppel, we think that it was just such considerations as these which led the CAB to a construction of the tariff which accords with our views. We need not determine the frequent question of "primary jurisdiction," River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1959, 253 F.2d 922, 925. For the Commission has already acted and its decision, especially on factors of public interest, is entitled to considerable weight. Southwestern Sugar & Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334. The action by the CAB is unique for, unlike the usual situation where action is offered as a precedent only, the action here arises out of these military charters. Subsequent to the decision of the District Court, the military services declined to proffer further charters unless the carriers agreed to be bound by the ferry mileage specified in the bid. Associated attempted to file such a tariff.[29] The Board rejected this as "unlawful for violation of the Board's Economic Regulations in that [the proposal] contained provisions so stated as to render it impossible to determine the application thereof and resultant charges."[30]

Subsequently, the carriers petitioned the CAB to reconsider and accept the tariff or to exempt the carriers from the provisions of §§ 403 and 404, note 14, supra. The Board denied the petition for reconsideration thereby affirming the action of the delegated subordinate. But it then proceeded to grant the exemption from § 403. To the military's insistence, which parallels the Government's position here, that it must know in advance

26. See, for example, the now famed Section 22 quotations for rail movements, 49 U.S.C.A. § 22; and 49 U.S.C.A. § 65 as to land grant rates.

27. In the ceaseless struggle against transportation discriminations, Congress is unwilling, as suggested by the Government's brief here, to trust to unfair trade practice proceedings under § 411, Civil Aeronautics Act of 1938, 49 U.S.C. § 491, superseded by § 411, Federal Aviation Act of 1958, 49 U.S.C.A. § 1381.

28. See note 14, supra.

29. It prescribed as a substitute for ferry miles, note 10, supra, the following:
"(g) Ferry Miles: Statute air miles between specified points to be flown by an aircraft without passengers or cargo to position the aircraft at the origin of a charter flight and to reposition the aircraft after termination of a charter flight, both agreed upon in advance of the performance of the charter flight. The charterer shall not be liable for any ferry mileage flown by the aircraft in excess of that agreed upon in advance."

30. The action was taken pursuant to delegated authority 23 F.R. 2946 (1948). The Board's Economic Regulations give the Board power to reject any tariff publication which is not consistent with § 403 of the Act and a rejected tariff is void and must not be used. See Section 221.180, 182.

of the exact maximum charges on the basis of ferry mileage bid, the CAB held not only that the present tariff did not do so, but it went even further. It stated "an effective tariff cannot be devised which would meet the Military bid requirements at this time and still not violate section 403 * * * ."[31] This was a declaration that the tariff as constructed, and as sought to be amended, prohibited the use of extraneous collateral contract bids. Further, it was a determination that since the use of the bids as the basis for the· charge was outside the tariff, its use would be forbidden under § 403, note 14, supra, unless, under the Board's power, §§ 205 and 416, it determined as a matter of specific public interest, that compliance could be excused. This determination of the public interest feature is a factor committed primarily to its guidance and determination. Implicit in it is a declaration that the policies of the Act against secret rebates and discrimination would be imperiled unless, by specific published order, the carriers for a particular type of traffic may for a limited time resort to agreements outside the four corners of the tariff.

As such, we are in harmony on both the construction of the tariff and the reasons forbidding the use of bids under the guise of estoppel.

VII.

Finally, we must deal with the tag end controversy on the allowance of costs. The case is to remind counsel who contend with or against the Government that when Justice Holmes talked about turning square corners, he meant square, square corners. For though the Government has the benefit of the efficient labors of the Commissioner (whose fee was paid by both and not here under review) who could render his report with its commendable accuracy only by the use of a stenographic record of these prolonged proceedings, it makes the point which the cases so clearly affirm, that it is not liable for costs except by statute.[32] The District Court's effort to do equity and to make each bear one-half of these costs approximating $4,000 is unavailing. The fact that the Government filed a cross claim and both recovered and lost a substantial portion of it does not alter the situation. The lesson is a hard one to learn and can be expensive. But when faced with the sovereign as an adversary, stenographic and similar non-clerk's costs, if they are ultimately to be apportioned, must be handled on a pay-as-you-go basis so that the matter never gets as far as taxation of costs as such.

The cause is therefore affirmed in part and modified in part and reversed and re-

31. The order provides that solely with respect to charter operations for United States military services, the carriers are "exempted from the provisions of section 403 of the Act and the Board's Economic Regulations to the extent that said section and Economic Regulations would otherwise require such carriers to apply the ferry rates stated in their tariffs to the actual ferry mileage in those cases where such mileage exceeds that estimated in bids or contracts with" the military.

32. 28 U.S.C.A. § 2412 provides: (a) The United States shall be liable for fees and costs only when such liability is expressly provided for by Act of Congress." Sub-section (b) goes on to provide that in the Tucker Act (28 U.S.C.A. § 1346 (a)) cases "(b) * * * if the United States puts in issue plaintiff's right to recover, the district court or Court of Claims may allow costs to the prevailing party from the time of joining such issue. Such costs shall include only those actually incurred for witnesses and fees paid to the clerk."

The cases affirm that statutory basis must be found. Ewing v. Gardner, 1951, 341 U.S. 321, 71 S.Ct. 684, 95 L.Ed. 968; United States v. Patterson, 5 Cir., 206 F.2d 345; Coyle Lines v. United States, 5 Cir., 1952, 198 F.2d 195; North Atlantic & Gulf S.S. Co. v. United States, 2 Cir., 1954, 209 F.2d 487; United States v. Poling Russell, Inc., 1954, 2 Cir., 212 F.2d 184.

Here the dispute was over the fee paid to the reporter for preparing the official transcript. Whether paid directly to the reporter or to him through the Clerk, such charge is not a "fee paid to the clerk" as required.

manded for further and other consistent proceedings.[33]

Affirmed in part; modified in part and remanded.

TUTTLE, Circuit Judge (dissenting).

With deference to the views of my colleagues, I am constrained to dissent. In the simplest terms in which I am able to state the issue it is: In 1951 irregular air carriers were authorized by action of the C.A.B. to engage in the carriage of military personnel by contracting for charter flights upon the filing of tariffs, the relevant portions of which are set out in footnotes 7 through 13 of the opinion; the military services were using not only air, but also rail and bus transportation; in order to determine which type of transportation to use the military service needed to know the cost of the transportation, even though the cost alone was not always the sole deciding factor;[1] in order to ascertain the cost of a proposed movement the local command requested a bid from a carrier such as the appellee; this bid designated a specified aircraft, showed the place where the passengers were to be picked up, the place to which they were to be flown and also the place where the aircraft was to be *based* before flying to the point of pick-up of the passengers; it also prescribed the point to which it was to be returned after completing carriage of passengers; if the bid was accepted the plane was flown to the point of pick-up, the passengers were carried, and the plane was returned to the designated point of rest. The two trips flown without passengers were known as "front" and "rear" ferry flights.

Out of the many trips flown (known as CAM's) a number involved ferry flights from points more distant from the point of pick-up than those specified in the bid. The government contends that the rate of pay provided for "ferry miles" as prescribed in the tariff should apply only to the agreed itinerary as stated in the bid, whereas the carrier claims it is entitled to have the rate of pay per mile for the miles actually flown without reference to the points of departure named in the bid.

I agree that the contract of carriage controls, and that the understanding or notice to the agents or officers of the parties is immaterial to the proper determination of the issue before us. The point at which I depart from my colleagues is that I think it clear that the contract of carriage calls for application of the tariff rate to the number of miles between the points between which the parties *agreed* the chartered plane was to fly rather than between those points between which it did actually fly, if the latter distance was greater.

Of course, no tariff has any life as a contract until it is called into being by a shipper ordering transportation from a carrier. Moreover, I know of no rule of law that prevents a shipper from agreeing with a charter carrier as to what the point of origin, intermediate points and point of destination shall be. For carriers other than operators of chartered transport the cost of the carriage can readily be determined by reference to filed tariffs between fixed points. For a carrier which operates charter service, too, the shipper can readily ascertain the cost of the transportation *per mile* by reference to the

---

33. The net result on remand will be that Associated will recover its claims on Group Nos. 1a, 1b, 1c, 2a, 2b, 2c, 8, 10, and 11 and, only to the extent allowed by the Commissioner, group 6. We agree with the District Court that Associated may not recover on its claims for Groups 3, 4, 5, 7, 9a, and 9b and that part of Group 6 disallowed by the Commissioner.

The Government will recover on its counterclaims for Group Nos. 12 and 15 and only that part of Groups 13 and 17 as allowed by the Commissioner. We agree that the Government may not recover on its counterclaims for Group Nos. 14 and 16 and that part of Group 13 and 17 disallowed by the Commissioner.

1. It is not significant that cost alone did not always control. It is undisputed that cost was a factor in making the comparison, and if it was a factor, it had to be known quite as much as if it were always the controlling factor.

tariff, which states the charge per mile for "live miles" and the lower cost per mile for "ferry miles." But in the case of a charter carrier the shipper cannot know that a plane will be available to it at any given point. This can be known only if the shipper agrees that the chartered plane will be based at a given point. Therefore, the only unknown quantity for which a bid is of any value at all is: where will the plane be based before flying to the point of pick-up? This is the only element of cost that the using service cannot determine by the simple matter of multiplying the live miles by the known distance between pick-up and destination. Since the record discloses that the mode of transportation used by the military services must be determined by considering the comparative costs of competing forms of transportation, we cannot, it seems to me, hold that the term of the contract which alone furnished the element by which cost could be computed is void and of no effect unless such result is demanded by some positive command of statute or decisional law. It is my opinion that there is no law requiring that we hold that the term of the contract prescribing the point where the chartered aircraft is based is void and of no effect merely upon a showing that the aircraft was actually flown from some different point to pick up its passengers.

The opinion of the majority is posited on the proposition that the provisions of the tariff are absolutely binding, and they may not be departed from. Certainly that is true as to those matters which the tariff is designed to cover. I have never known, however, of a tariff being designed to determine the terminal points of a shipment to which its rate schedules will then apply. The opinion here finds such determination of terminal points in the *definition* of "ferry miles," footnote 10, which defines ferry miles thus: "means miles which Carrier is required to operate an aircraft without payload between points where it is based by the Carrier and the origin of a charter flight and between the destination of a charter

flight and the point to which the aircraft is to be returned for the next operation by the carrier."

It seems clear to me that the definition clause was not intended to answer the substantive question of what were the points of origin and destination of the charter at all, but was rather intended to distinguish between "dead head miles" and "live carriage miles" to which different rates apply. Nevertheless, the government does not urge this point, and I assume, for the purpose of expressing the views here, that this definition is controlling. It becomes necessary then to construe it. The opinion of the Court says: "The tariff is self-sufficient and needs no extraneous agreement on standards." It seems to me that this is meaningless or that it is patently incorrect, because the entire formula of rates is to be applied, as to ferry miles, on the number of "miles which Carrier is *required* to operate [the] aircraft without payload between points *where it is based* by the Carrier and the origin of a charter flight." (Emphasis added.) The opinion itself recognizes the need to go outside the language of the tariff to ascertain where the aircraft *is* based. It approved the trial court's determination that in effect the aircraft were *based* wherever they happened to *be* immediately preceding their use for a particular CAM so long as they did not get there as a result of a commercial rather than military flight. It also approved the court's finding that the flight from such place was *"required"* unless it was done for maintenance, for carriage of other passengers, or on a dog-leg route.

It seems to me that there is a fundamental error in the Court's construction of this definition paragraph to fix points of origin and destination. A plane is not necessarily *based* wherever it happens to be at rest. Where it is *based* is a matter of intent on the part of its owners, and it seems to me that what the bid did here, and what it was intended to do, was to fix by agreement where the specified aircraft was to be *based* prior to its being dispatched for the live mileage.

The opinion recognizes the necessity to go outside the tariff to find where the plane was based. It simply assumes that it was based wherever it was found. I think it was based where the parties agreed it was based.

Thus, within the terms of the bid, which when accepted, called the tariff into life, and the tariff itself, all the terms necessary to determine the cost of carriage are spelled out. The parties agreed that as to a particular CAM (to use the illustration in footnote 5) the troops were to be carried from San Antonio to Memphis, and that the plane was to be *based* at El Paso. The using service could then compute the cost for charter miles from San Antonio to Memphis and the ferry miles from El Paso to San Antonio. The bid would thus have some meaning. It would contain all the elements necessary for the using service to compare the cost with competing types of transportation. Now, where it develops that the designated aircraft for the CAM was actually in Albuquerque before being flown to San Antonio, this does not, it seems to me, change the fact that it was *based* in El Paso as stated in the bid. In other words, I think the answer to the question "where is the aircraft's *base* from which point the carrier is required to ferry it?" is found by reference to the parties' contract touching on that identical point rather than by asking, "where was the aircraft *flown from* to pick up the passengers at San Antonio?"

There are several circumstances in this case and in transportation law in general that, it seems to me, strongly support this construction. The first is the introductory clause of the tariff itself:

"Application of the Tariff:

"This tariff is published and filed * * * on behalf of the following participating carriers * * * for the provision of air Transportation under [C.A.B.] Order No.

2. As I have previously said, I doubt seriously whether these substantive matters were intended to be controlled by the sections *defining* terms of the contract.

E–5166, dated March 21, 1951, *pursuant to contracts with departments of the military establishment* and of uniformed military personnel traveling at their own expense to or from miltary bases designated by departments of the military establishment." (Emphasis added.)

Thus, it is clear that the tariff clearly assumes, as it must, the making of a contract of carriage. Such a contract must define the service to be performed. It sets out in the definition section next discussed the yardstick to which the tariff rates for the two defined types of ferry flights are to be applied.

The next such circumstance is the definition clause which describes "charterer" as follows.[2]

"Charterer: means a person, group of persons, firm, partnership, association, corporation or body politic acquiring,

"[1] at a fixed charge,

"[2] the use of an aircraft operated by Carrier for

"[3] the transportation of persons

"[4] from a specified origin to a specified destination or

"[5] for a particular itinerary,

"[6] agreed upon in advance."

Note: brackets inserted:

This clause makes clear that what is dealt with here is a shipper (the government) that has acquired at a *fixed charge* an aircraft for transportation *from a specified origin to a specified destination or for a particular itinerary, agreed upon in advance.* Practically every term of the definition emphasizes the idea of an *agreed definite* understanding as to the *origin* and *destination* of the flight and the *charge* to be made. This strongly supports my understanding that the "ferry miles" clause is to be construed to refer to a base already agreed on.

However, if we assume the definition sections are to be given such effect, then all of them must be considered.

The third circumstance is the general proposition, in my opinion too lightly dismissed by the majority, that the purpose of a tariff is to let the shipper know *what services* a carrier will furnish under certain conditions and at *what price.* Union Wire Rope Corp. v. Atchison, T. & S. F. Ry. Co., 8 Cir., 66 F.2d 965, 966. This Court has said that tariffs "must be expressed in clear and plain terms, so that those dealing with and governed by them may understand them and act advisedly." Atlantic Coast Line R. Co. v. Atlantic Bridge Co., 5 Cir., 57 F.2d 654, 655. Is it possible for any one to say here that a shipper would be expected to find the point of origin of a charter flight fixed by the language of a *definition* section when the parties have already attempted to fix it by the contract calling the tariff into life? Also, the Court of Appeals for the Ninth Circuit said of tariffs generally:

> "It is a general principle of transportation law that tariff rates must be determinable at the time the shipment is made." United States v. Spokane, Portland & Seattle Ry. Co., 9 Cir., 261 F.2d 681, 684.

In rejecting the government's contention that tariff rates must be *determinable* at the time the shipment is made, the majority opinion speaks of it as though it were a contention for "a requirement of preshipment calculation of exact cost." Of course, the government makes no such contention. It merely argues, and I think correctly, that the *formula* by which the charge can be figured and the *yardstick* to which it is to be applied must be contained in the tariff or be agreed to in advance of shipment. Here, unless the specified points of departure are taken as agreed to in the bid, the one essential fact permitting such computation is entirely missing.

It seems to me to be clear that nothing in the tariff had the effect of changing the contractual terms designating the base from which the ferry mileage was to be computed. It seems plain that if the definition section is to be looked to for the purpose of ascertaining what mileage was ferry mileage, it prescribed it as between the place where the parties had agreed the plane was based and the origin of the charter miles rather than, as the Court has decided, between whatever place the plane was found and such place of origin.

The majority criticizes the government for contending that the bid base controls if the plane traveled in excess of that mileage but that the actual miles control if the plane traveled less than the distance between the bid base and place of origin of the charter flight. I think this is strictly in line with general transportation law which prohibits a carrier from collecting for services not actually performed. Moreover, both the bid contract and the definition clause provided for this treatment. The bid contract provided "if the agreed upon ferry mileage can be eliminated or reduced by rescheduling the assigned equipment in regular or chartered services, the benefit of such reduction in ferry miles flown shall be credited back to the [government]." It is against this term of the bid contract that we read the language of the definition section: "miles which Carrier is *required* to operate an aircraft without payload between points where it is based, etc." If the carrier is not *required* to operate the aircraft as many miles as the bid contract specifies, the tariff definition itself excludes the excess miles. Thus it is, that the government contends, correctly I think, that this is a contract that, coupled with the filed tariff, prescribes a maximum charge for the charter service.

That this is not deemed either economically unfair or morally or ethically improper is indicated by the fact that the C.A.B. at the instance of both the *carrier and the government* has, by the granting of an exemption, authorized charter contracts, spelling out this precise arrangement. Civil Aeronautics Board, Order No. E–13158, Docket No. 7186.9916, dated November 14, 1958.

I think, therefore, that this obligation of the government for charter charges was fixed by the tariff based on the stated base of the aircraft in each CAM less such amount as represented mileage not

actually flown between the specified base and the place of origin of the charter flight. What has been said relating to the front ferry miles should, of course, be applied equally to rear ferry miles. This is: the mileage payable to the *specified* point of rest is the maximum for computing the charter cost, the actual mileage flown, if *less* than that, to be the actual basis of the charge.

We are told by the government that the method of computation, which I think is called for, was acquiesced in by the carriers for the first two years of these operations. 33 Comp.Gen. 483,487. Such conduct, of course, would not be effective to change the contract of carriage, since one of the significant things about tariffs, agreed to by all members of the court, is that the parties cannot by agreement change the filed tariff. It is significant, however, I think, when we are faced with a problem of construing the contract, since the construction placed upon it by the parties is somewhat persuasive as to its proper construction.

I would reverse the judgment and remand for a finding of the sum due the parties in accordance with the legal principles enunciated here.