TWENTIETH CENTURY AIRCRAFT, INC., Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 19796, 19797.

United States Court of Appeals Ninth Circuit.

Sept. 30, 1965.

Harold B. Bernson, Goldstein & Bernson, Beverly Hills, Cal., for appellant.

John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Edward Berlin, Attys., Dept. of Justice, Washington, D. C., Manuel L. Real, U. S. Atty., Los Angeles, Cal., for appellee.

Before JERTBERG and BROWNING, Circuit Judges, and MUECKE, District Judge.

MUECKE, District Judge.

This is an appeal from a Judgment entered on October 8, 1964, by the United States District Court for the Southern District of California, Central Division, denying appellant's tenth counterclaim and dismissing an independent action seeking judgment in the amount of $545,-162.25.

The action had been commenced by the government seeking restitution in the amount of $89,335.14, for an alleged overpayment made in connection with domestic charter flights by appellant of United States military personnel and freight during the years 1957–1960. Original jurisdiction was founded on 28 U.S.C. § 1345.

The appellant answered, admitting overpayment in the sum of $43,179.95, but denying there had been overpayment in the amount asserted by the government. The answer also contained nine counterclaims against the government seeking to recover funds appellant claimed were erroneously withheld by the United States in order to apply them against prior debts of the appellant. The jurisdictional basis for these nine counterclaims was 28 U.S.C. § 2406. An amended answer and counterclaim filed by appellant added a tenth counterclaim seeking recovery for "ferry"[1] mileage actually flown, but which exceeded the mileage specified in the charter bids submitted on behalf of appellant. Appellant also instituted an independent action seeking the same relief as the tenth counterclaim, together with recovery of cash discounts which had been given to the government as consideration for payment of the contract price within ten days of submission of the claim. The jurisdictional basis for the tenth counterclaim and the independent action was 28 U.S.C. § 1346.

The two actions were consolidated by the District Court and presented on the basis of stipulated facts and issues of law.

The District Court granted appellant's first nine counterclaims, thereby permitting set-off in the amount of $45,-667.45. However, the Court denied appellant's tenth counterclaim and dismissed appellant's independent action. The net result was a judgment in favor of the appellee in the sum of $43,667.69. This appeal, therefore, stems from the Court's denial of the tenth counterclaim and dismissal of the independent action.

1. Ferry miles means miles which carrier is required to operate an aircraft without payload between points where it is based by the carrier and the origin of a charter flight and between the destination of a charter flight and the point to which the aircraft is to be returned for the next operation by the carrier, also such other flights of the chartered aircraft, unoccupied by passengers and their baggage, equipment or other property as may be necessary to provide the kind of trip charterer requests.

During the Korean conflict the armed forces were faced with a sharply increased need for domestic transportation to move its troops and personnel from one base or location to another. To help satisfy this demand, the Civil Aeronautics Board (CAB) in 1951 authorized a number of irregular carriers to provide charter service to the military. Three competing associations were formed for the purpose of representing air carriers: Air Transport Association, Air Coach Transportation Association, and Independent Airlines Association. Each of these associations entered into Joint Military Air Transportation Agreements with the Military Traffic Management Agency (MTMA), which was responsible for the procurement of domestic military transportation. Each charter flight was a separate transaction known as a Commercial Air Movement (CAM). Twentieth Century Aircraft, Inc., appellant herein, was a commercial air carrier which executed an agreement with the Independent Airlines Association whereby that association agreed to represent it in the CAM program. Appellant agreed to abide by all of the provisions pertaining to tariffs. Since it had not filed tariffs, the appellant quoted its rates to the MTMA by letter. Charges for the charter service were, in the case of common carriers, to be computed in accordance with tariffs on file with the CAB. Since appellant had no rates on file with the CAB, its charges were to be computed in accordance with the rate schedules it filed with the MTMA.

There were two classes of mileage: Live miles and ferry miles. The former included those miles over which a chartered aircraft was engaged in the carriage of passengers on behalf of the government. Ferry miles embraced mileage which the carrier was required to operate an aircraft without payload between points where it was based by the carrier and the origin of a charter flight (front ferry mileage) and the point to which the aircraft was to be returned for the next operation of the carrier (rear ferry mileage).

When a need arose to transport troops, MTMA would advise the various associations of the intended movement. Acting on behalf of its members, the associations would respond by submitting bids containing the identity of the interested carrier, the type of aircraft, the origins and destinations of all flights, both ferry and live, the mileage, rates, and total charge. The bids were then evaluated by the MTMA which would then award the charter contract to the carrier best meeting the needs of the military.

After the completion of each CAM, the association prepared a charter certificate containing all the information which had previously been set forth in the bid. If the certificate was found to be in conformance with the bid (or with any change agreed to after the bid had been submitted), it was approved by MTMA and returned to the carrier which presented it to the government disbursing officers for payment. Following the payment of the carrier, an audit of the accounts would be commenced including an examination of flight logs and plans to substantiate the mileage claimed. Where a post audit showed that ferry mileage as shown in the charter certificate had not actually been flown, the carrier was requested to refund sums paid for such mileage. However, no credit or payment was permitted for ferry mileage actually flown in excess of the amount bid.

After performance of the transportation by appellant herein, payment therefor and an audit of the accounts, a determination was reached that appellant had been overpaid. When the carrier refused to refund the amount demanded, the instant case was commenced.

The primary issue presented by this appeal is whether or not appellant is entitled to extra compensation because of "ferry" flights *actually* flown but which were in excess of the mileage specified in the charter bids.

Appellant contends that it was treated as a common carrier by the government;

that the rates it filed were tariffs which were controlling without reference to outside agreements, contracts, or understandings; and that the bids it submitted were educated estimates, and were not offers capable of being accepted so as to form a contract of carriage. Therefore, appellant reasons, it is entitled to be compensated for all ferry miles flown by it which were *actually required* to be flown in order to perform the charters.

The government, on the other hand, argues that appellant is a contract carrier which was not required to file tariffs with the CAB, and that upon acceptance of the bid submitted by the carrier a binding contract of carriage was formed. Therefore, the compensation of appellant depended solely upon the terms of the contract arising out of the bids offered and accepted by the government. Furthermore, the government asserts, the United States never authorized the carrier to fly additional mileage over and above that contained in the contract of carriage and consequently never incurred any obligation to pay for it: if the mileage was flown, as alleged, it was flown voluntarily for the convenience of the carrier and not pursuant to any agreement with the United States.

We find no merit in appellant's argument that it was a common carrier; that it was treated as such and was paid in accordance with the provisions applicable to the common carrier participants of the CAM program, and therefore is entitled to recovery for all ferry flights actually required to be flown. Although the government alleged in its complaint that the appellant was and is a common carrier, we do not feel that it is estopped from asserting otherwise. On the contrary, the conclusion is inescapable that appellant was in fact a contract carrier. Section 403 of the Federal Aviation Act, 49 U.S.C. § 1373 (1958) provides that every "air carrier" shall file with the board tariffs showing all rates, fares, and charges for "air transportation." It provides also that such "air carriers" are prohibited from charging or demanding or collecting a greater or less or different compensation than the rates, fares, and charges specified in its filed tariff. The question is thus whether appellant is deemed to be an "air carrier" within the purview of this statute. The term "air carrier" is defined in 49 U.S.C. § 1301(3) as any citizen of the United States who undertakes to engage in "air transportation," which, in turn, is defined as "the carriage by aircraft of persons or property *as a common carrier* for compensation or hire * * *." 49 U.S.C. § 1301 (21). Therefore, since appellant was not required to file a tariff pursuant to 49 U.S.C. § 1373, it is deemed not to be a common carrier, but rather, a contract carrier. It is true that appellant was required to file statements of charges with the Board; but that requirement was imposed as a condition of its enjoying representation by the association and participation in the CAM program. In order to prevent contract carriers who were not required to file tariffs from continually underbidding common carriers who had tariffs on file, the Board on November 14, 1958, issued an Order (that went into effect May 12, 1959) requiring CAM participants to "amend their existing contracts with IAA by appending thereto a statement of charges for CAM operations." The Board stated the problem as follows:

> "Part 45 operators can, of course, bid on CAM traffic without regard to officially filed tariffs, a situation which may enable them to consistently underbid supplemental air carriers who are bound by tariffs on file with the Board. By itself, this is a matter over which the Board has no jurisdiction. However, to the extent that such a situation may occur as a result of working arrangements existing between an association of supplemental air carriers and Part 45 operators, reappraisal seems to be in order.

> "The present situation results in an inequality of competitive position as between supplemental and Part 45 carriers which could in the future have serious consequences to the

economic health of the industry. While there has been no showing by the Supplemental Air Carrier Conference that the use of IAA's services by Part 45 operators has thus far produced the result feared, we believe that such use is sufficiently fraught with potential dangers to justify our taking preventive action now, rather than speculate as to our ability to control conditions by taking action after a serious competitive conflict has developed. Therefore, pending decision by the Board on Agreement CAM No. 11307–A4, Part 45 operators will be required to amend their existing contracts with IAA by appending thereto a statement of charges for CAM operations. Also, other Part 45 operators desiring to utilize the services and facilities of IAA will be required to include a statement of charges for CAM operations in their contract with IAA. The Board will require further that such amended contracts and any new contracts be filed with the Board by IAA. Each such statement of charges shall conform in substance with the pertinent requirements of Part 221 of the Board's Economic Regulations * * *."

The appellant, therefore, had no tariff on file with the CAB. Rather, it informally advised the MTMA of its rates by letter. The actual computation of ferry mileage required reference to the bids submitted by the association on the carrier's behalf in an effort to obtain the charter contracts. The bids specified the origins and destinations of all flights, both ferry or live, the mileage between points, the rates per mile, both for ferry and live mileage, and the total charge for the charter. Thus, the measure of compensation was governed solely by the representations made in the bids.

Furthermore, MTMA required Part 45 operators (contract carriers) to file letters indicating their intent to be bound by the agreement that the maximum ferry mileage for which it would claim payment would be that specified in its bids. The appellant, by letter of January 29, 1959, advised the Agency "that the ferry miles specified in our tenders will be maximum ferry mileage, for which payment will be sought."

The Court is of the view that appellant is bound by the contract formed when it was awarded the contract of carriage. Indeed, the agreement formed by the respective parties to this suit contained sufficient flexibility so as to protect the carrier from unforeseeable contingencies that might arise between the time the bid was accepted and the time for performance warranting an alteration of the contract. These contingencies were expressly provided for in the Joint Military Air Transportation Agreements, which stated that any variation in services resulting in an increase in costs must be approved by the appropriate agency, and then noted in the charter certificates. Nevertheless, appellant at no time sought to avail itself of that provision of the agreement even when it knew that additional ferry mileage was required immediately after performance of the contract, but before submission of the charter certificates.

It might appear inequitable for the government to be able to deviate from the bid when it is to its advantage, i. e., to recover a refund when the actual ferry mileage flown by a carrier is less than that stated in the bid, and then to confine a carrier to its bid (charter) when actually the carrier has been required to fly ferry mileage in excess of that specified in its bid. However, government contracting officers must know the cost of goods and services in advance of procurement and the award of contracts, since they are required to procure goods and services in the most economical manner commensurate with government needs. In the course of normal operations, cost must be the controlling factor in awarding a contract based on bids submitted by competing carriers.

Furthermore, it must be reemphasized that the carrier was afforded protection from unforeseeable contingencies arising

after its bid was submitted by an agreement with the government to the effect that a variation in services resulting in increased costs could be approved by the agency and then noted in the charter certificates. The record does not disclose that appellant ever made a claim for increased costs resulting from any such variation in services.

We therefore agree with the position of the government and, accordingly, uphold the ruling of the District Court. We hold that the bids submitted by appellant, pursuant to a request by the government, were offers, not estimates, which became executed contracts upon acceptance by the government; that the parties to the contract thus formed are bound by the terms of the contract; that tariff schedules for common carriers do not apply since appellant is a contract carrier, and that the compensation of appellant depends exclusively upon the terms of the contract.

The appellant places its chief reliance upon the case of United States v. Associated Air Transport, Inc., 275 F.2d 827 (5th Cir. 1960). This case held that the lawfully filed tariff of a common carrier established the measure of compensation for its services and that the contracts of carriage were not controlling where recovery was sought for all ferry miles required to be flown in the performance of a charter whether or not such mileage corresponded with the amount stated in the bid.

We do not find this case controlling because its facts are distinguishable from those of the case at bar. In Associated, the Court was dealing with a tariff lawfully filed on behalf of a common carrier. Here appellant was not clothed with the status of a common carrier and was not required to file tariffs with the CAB. The rule enunciated in Associated is inapplicable to the case at bar since appellant is not a common carrier and, accordingly, was under no legal obligation to file a schedule of its rates with the CAB.

Appellant also raises an issue concerning a discount applied by the government to the payments made to appellant for its carrier services. When the appellant presented its claims for payment to the government, it endorsed thereon an offer of a discount of the contract charge if payment were made within ten days of presentation. The government made prompt payment to take advantage of the discount. Appellant now contends that the discount it offered was illegal and therefore it is entitled to its recovery. Admittedly, the discount, if not provided for in its tariff, would have been illegal if the appellant had been a common carrier since it would have constituted a reduction in the tariff charge. However, we have ruled that appellant is not a common carrier, but rather, a contract carrier. Therefore, the tariff for common carriers does not apply. Having offered the discount and having accepted payment in accordance with its offer, we find no merit in appellant's argument.

Accordingly, the judgment of the United States District Court for the Southern District of California, Central Division, is affirmed.